## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :
    :
   v.    :   **3:21-CR-66**
    :   **(JUDGE MARIANI)**
RASHAWN HAWARI-RASULULLAH,    :
    :
    Defendant.    :

FILED
SCRANTON

FEB 0 8 2022

PER _____
DEPUTY CLERK

### MEMORANDUM OPINION

### I. INTRODUCTION

Here the Court considers Defendant Rashawn Hawari-Rasulullah's Motion to

Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States

Constitution (Motion for Hearing) (Doc. 40) filed on September 9, 2021. Defendant is

proceeding *pro se* in this matter. (*See* Doc. 31 at 1.[1])  Both Defendant and stand-by

counsel filed declarations in support of the Motion.  (Docs. 40-3, 40-4.)

The event at issue occurred at approximately 9:00 a.m. on November 22, 2020,

when Pennsylvania State Police Trooper Kody Nowicki stopped Defendant's vehicle on

Interstate 80 westbound in Monroe County, Pennsylvania.  (Doc. 40-3 ¶¶ 2-3; Doc. 43 at 3.)

The stop, which Nowicki informed Defendant was based on driving in the left lane and

exceeding the speed limit (Doc. 40-3 at 5; Doc. 43 at 5), led to Defendant's arrest, the

---

[1] Having conducted a hearing in accordance with *Faretta v. California*, 422 U.S. 806 (1975), on
August 12, 2021, by Order of August 13, 2021, the Court granted Defendant's request to represent himself
and appointed Attorney Elliot A. Smith from the Office of the Federal Public Defender as stand-by counsel
to assist Defendant in all matters pertaining to this action.  (Doc. 31 at 1.)

issuance of a search warrant to search the vehicle, and subsequent indictment on drug and weapons charges (Doc. 1).

Defendant alleges that his seizure by Nowicki was illegal under the Fourth Amendment and all evidence subsequently seized must be suppressed as fruits of the illegal conduct. (Doc. 41 at 4-9.) Defendant further asserts that the information contained in the warrant pursuant to which his vehicle was searched contained materially false statements or omissions, knowingly or recklessly made. (*Id*. at 10-11.)

With the filing of Defendant's reply brief (Doc. 49) on November 12, 2021, the pending motion was fully briefed. By Order of November 17, 2021, the Court scheduled an evidentiary hearing for February 17, 2022, at 10:30 a.m. (Doc. 50.)

Defendant's claimed entitlement to a hearing on the basis that the search warrant contains materially false statements or omissions requires the Court, prior to the hearing, to make a preliminary determination as to whether Defendant has made the requisite showing of entitlement to a hearing on this issue. *Franks v. Delaware*, 438 U.S. 154 (1987). To make this preliminary determination, the Court will review the factual background of the case leading up to the application for a search warrant and assess the propriety of the warrant based on evidence proffered by the parties in support of, and opposition to, the pending motion. This evidence includes "Mobile Video Recorder" (commonly referred to as "MVR" or "dash-cam") footage of the events of November 22, 2020. (Government's Exhibits 1-3; Defendant's Exhibit B.)

2

For the reasons that follow, the Court concludes that Defendant has not shown that he is entitled to a *Franks* hearing.  Therefore, Defendant's motion will be denied as to his request for a hearing on his issue.

## II. FACTUAL BACKGROUND

As noted above, the event giving rise to this action began at approximately 9:00 a.m. on November 22, 2020, when Pennsylvania State Police ("PSP") Trooper Kody Nowicki ("Nowicki") stopped Defendant's vehicle, a silver Hyundai Santa Fe, on Interstate 80 westbound in Monroe County.  (Doc. 40-3 ¶¶ 2-3; Doc. 43 at 3.)  Before stopping Defendant's vehicle, Nowicki's MVR shows the vehicle travelling in the left lane with no vehicles in the right lane.  (Nowicki MVR :45-1:00.[2])  After the vehicle came to a stop on the shoulder of the highway, Nowicki exited his car and approached the passenger side of Defendant's vehicle, shining a flashlight in the tailgate window as he went by.  (MVR1 2:45.)  Nowicki's interaction with Defendant begins with Nowicki introducing himself and informing Defendant that he was being stopped because he was driving in the left lane and slightly exceeding the speed limit.  (MVR1 2:55.)  After being asked for his license, registration, and proof of insurance, Defendant informed Nowicki that it was a rental car but he had left the rental agreement at his house in Cleveland and he had no registration or insurance

---

[2]  Time indicated is that identified in the MVR, i.e., elapsed time from when the recording began. Defendant notes that he does not stipulate to the authenticity of the video recording.  (Doc. 41 at 2 n.1.) Because Defendant objects only to the characterization of events which are shown on the MVR (*see*, *e.g.*, Doc. 40-3, Doc. 41 at 1-3, Doc. 49 at 1-5), the Court's background recitation properly includes facts observed on Nowicki's MVR which will hereinafter be cited as "MVR1."

information.  (MVR1 3:11.)   When asked about the specific rental company, Defendant did

not immediately answer but, after a brief delay, identified Dollar as the rental company.

(MVR1 3:55-4:10.)  Questions about who had rented the car followed.  (MVR1 4:11.)

Defendant said his "bro" had rented the car and, when Nowicki sought confirmation that it

was his "brother," Defendant confirmed that it was.  (MVR1 4:14.)

Nowicki then commented that it was cold, asked Defendant if he had a jacket, and

Defendant responded that he did not.  (MVR1 4:20.)  Shortly thereafter, Nowicki asked

Defendant to come back to his vehicle and told Defendant that he was not making him do it.

(MVR1 4:33.)  Defendant exited his vehicle and Nowicki asked "no weapons on you or

anything like that?" to which Defendant responded "no."  (MVR1 4:46.)  When Nowicki

asked "Do you mind if I just pat you down real quick?" Defendant did not object.  (MVR1

4:48.)   After a brief pat down, they proceeded toward Nowicki's vehicle.

What follows is audio where Defendant is presumably standing by the passenger

door with Nowicki in the car making small talk and asking questions about Defendant's

travel.  (MVR1 5:22.)  Defendant said that he stayed with family around JFK/Queens.

(MVR1 7:15.)  Nowicki also asked Defendant if he has ever been in legal trouble, and

Defendant responded that he is in a situation trying to get custody of his young daughter.

(MVR1 8:00.)  Nowicki again asked who rented the vehicle and Defendant responded that

his close friend did.  (MVR1 8:40.)  When asked why he did not rent the vehicle, Defendant

replied that he had spent the limit on his credit card.  (MVR1 8:50.)

When Defendant asked if he could sit down, Nowicki confirmed that Defendant meant up at his car and said "OK," adding that he would go to Defendant's car with him. (MVR1 9:47.)  Defendant is then seen walking to the driver's door of his car.  Nowicki stopped at the tailgate and asked Defendant to join him there because Nowicki wanted to ask a few questions.  (MVR1 10:00.)   Defendant joined Nowicki at the tailgate, and Nowicki asked him whether there was any weapon in the car, followed by questions about whether specific controlled substances (marijuana, heroin, methamphetamine, cocaine) were in the car.  (MVR1 10:05.)  In each instance, Defendant answered in the negative.  (*Id.*) Thereafter, Nowicki asked Defendant if he had permission to search the car and Defendant answered no.  (MVR 1 10:20.)

Nowicki then again questioned Defendant about whether he had a jacket.  (MVR1 10:22.)  Defendant responded that he would get his jacket which he indicated was in the car.  (*Id.*)   As Defendant continued to walk toward the driver-side door, Nowicki said he would get the jacket, adding that he did not want Defendant "jumping in there."  (MVR1 10:26.)  Nowicki then said "wait, wait, wait" as Defendant proceeded to open the door.  (*Id.*) Nowicki repeated that he would grab the jacket, but Defendant got into the car indicating the jacket was "right there."  (MVR1 10:33.)  While leaning into the vehicle, Nowicki stated "yeah, you're going to step out with me" followed by repeatedly yelling, with increasing intensity, "don't do it!"  (MVR1 10:45.)  At this point on the MVR, another officer can be seen walking toward the passenger side of Defendant's vehicle.  (MVR1 10:47.)

With an obvious scuffle occurring in the front seat, Defendant's vehicle moved forward, veered off the road and down an embankment, and came to rest in a wooded area at the bottom of the hill. (MVR1 10:48-11:00.) The second officer, PSP Trooper Jonathan Lazarchick, ran down the embankment. (*Id.*) After the car stopped, it appears that Nowicki pulled Defendant out of the car and they both fell to the ground. (MVR1 11:05.) At about this time, another PSP vehicle arrived. (MVR1 11:03.) Lazarchick and the third officer, PSP Trooper Thomas Rehberg, ran to assist Nowicki and an officer can be heard yelling several times for Defendant to "stop resisting." (MVR1 11:18.) An officer can also be heard telling Defendant to get his hands behind his back and "get your hand out" before Defendant was placed in handcuffs. (MVR1 11:30.)

Nowicki then staggered up the bank and collapsed on the ground while another officer called for EMS. (MVR1 12:00.) After several more officers arrived, Defendant was escorted up the bank and left the scene. (MVR1 17:50.) Nowicki remained lying on the bank until the ambulance arrived. (MVR1 21.00.) At about this time, officers on scene photographed the site and appeared to comb the area of tall brush where Defendant's vehicle came to rest. (MVR2 25:30.[3]) Several minutes later, an officer searching near the vehicle appears to summon others. (MVR2 32:00.) When the officers disperse, one of

---

[3] MVR2 is the Mobile Vehicle Recording from Trooper Lazarchick's vehicle.

them is carrying a large manilla envelope, the contents of which are unknown to the viewer. (MVR2 38:00.)

Trooper Ian Macmillan was assigned as the lead investigator of this incident. (Doc. 43 at 14.)  At Macmillan's request, the PSP Drug Detection Canine Unit was called to conduct an exterior sweep of Defendant's vehicle. (Doc. 43 at 14.)  PSP Corporal Anthony Doblovasky and canine Molly responded and conducted the requested sweep.[4] (*Id.*)  The government asserts that Doblovasky advised Macmillan that Molly had alerted/indicated to the presence of controlled substances in the vehicle. (*Id.*)

The government further asserts that, after conducting interviews with Nowicki, Lazarchick, and Rehberg and viewing the MVR recordings, Macmillan applied for a search warrant to search the interior of Defendant's vehicle. (*Id.* at 15.)  The Affidavit of Probable Cause completed by Macmillan states the following in pertinent part:

> On Sunday, November 22, 2020, at approximately 0900 hours, Trooper Kody NOWICKI effected a traffic stop on a silver-Hyundai Sant Fe . . . for traffic violations on interstate 80 Westbound, at Mile Marker 288.2, Tobyhanna Township, Monroe County.
>
> Trooper Kody NOWICKI contacted the operator identified to be Rashawn HAWARI-[R]ASSULULLAH, DOB: 3/19/83, by his Ohio driver's license information. After the Initial Interaction, Trooper NOWICKI requested the operator exit the vehicle for further questioning at his Patrol vehicle. Further indicators of criminal activity were developed during the course of the investigation. When a backup officer arrived on scene, Trooper NOWICKI requested the operator meet him in front of the Patrol vehicle.  Further

---

[4] The record contains various spellings of Corporal Doblovasky's last name (Doblovsky, Doblovosky). (*See, e.g.*, Doc. 43 at 14; Doc. 43-3 at 3.)  The Pennsylvania State Police Fern Ridge Barracks confirmed that Doblovasky is the correct spelling.

investigatory questioning occurred, and the operator refused a consent search. Following that Interaction, the operator walked to the driver's side of the vehicle and got back in the car, Trooper NOWICKI followed and attempted to get the operator back out of the vehicle.   The operator did not follow Trooper NOWICKI's orders and subsequently he put the car into drive and accelerated westbound along the berm of Interstate 80 at a high rate of speed.   Trooper NOWICKI was partially in the vehicle when the operator attempted to flee.   The vehicle left the Interstate, traveled down the embankment and into the wooded area to the north of the interstate, coming to a final rest in the woods.   During the incident, Trooper NOWICKI was able to pull himself into the vehicle.   After impact, the operator ended up in the passenger side of the vehicle and actively resisted and fought with Trooper NOWICKI.   The operator was removed from the vehicle and continue[d] to physically resist Troopers Kody NOWICKI and Jonathan LAZARCHICK'S commands.

The physical struggle between Troopers and HAWARI-[R]ASULULLAH continued on the embankment.   HAWARI-[R]ASULULLAH refused to remove his hands from under him during the struggle and continued to resist.   A third Trooper arrived, and scene [sic] and the department issued taser was deployed.   HAWARI-[R]ASULULLAH was handcuffed behind his back and taken into custody.

A tan, Cobra FS380 handgun, S/N FS112393, was discovered on the ground directly under where the struggle with HAWARI-[R]ASULULLAH occurred. HAWARI-[R]ASULULLAH has a criminal history to include convictions of aggravated robbery, carrying a concealed weapon, assault, and resisting arrest.   He also has an active, felony grade, controlled substance case out of Ohio.   Additionally, he was indicted and convicted on federal firearms charges.

As a result of the incident, Trooper NOWICKI sustained bodily injury to include significant chest pain and arm pain.   Trooper NOWICKI was transported to Lehigh Valley Hospital Pocono Emergency Department via EMS.   Trooper NOWICKI sustained a chest wall contusion and a shoulder strain as a result of the incident.

. . . .

. . .   During the course of the traffic stop and based on Trooper NOWICKI'S interview, I observed the following indicators of criminal activity:

8

- Trooper NOWICKI related prior to the stop, he observed the suspect vehicle had a strong driver reaction to his presence.

- Mr. HAWARI-RASULULLAH was traveling from a known source drug area to another known source drug area (New York City, NY to Cleveland, OH). He was also travelling on the known drug corridor of Interstate 80.

- Mr. HAWARI-RASULULLAH was operating a third-party rental vehicle. Through my training and experience I know rental vehicles are commonly used in the commission of criminal activity because the[y] blend in with routine traffic; are reliable and will get the individual from point A to B; have a built in defense to any items that may later be discovered by police and are not subject for forfeiture if caught. Third-party rental vehicles add another layer of separation and are commonly used by drug trafficking organizations.

- Mr. HAWARI-RASULULLAH had an extensive criminal history for weapons violations and an open case for felony drug charges.

- Mr. HAWARI-RASULULLAH claimed to have stayed in New York for approximately three days. Per Tpr. NOWICKI, there was no luggage in the suspect vehicle.

- When questioned about possible contraband in the vehicle, Mr. HAWARI-RASULULLAH became visibly nervous. Specifically, when questioned about firearms and heroin.

- Mr. HAWARI-Rasulullah attempted to flee the scene of the traffic stop after being requested to consent to search the vehicle. Mr. HAWARI-RASULULLAH was placed in custody shortly after. A firearm was located in the immediate area of where Mr. HAWARI-RASULULLAH was placed in custody.

- When the suspect vehicle was towed to PSP Stroudsburg, I detected a strong odor of scent masking agent emitted from the open window of the vehicle.

Based on the above indicators of criminal activity I believe reasonable suspicion exists that Mr. HAWARI-RASULULLAH was involved in criminal

activity at the time of the traffic stop. Based on this information a PSP Drug Detection Canine Unit, Cpl. Anthony DOBLOVOSKY and canine Molly, were summoned to PSP Stroudsburg to conduct an exterior sweep of the vehicle. At the conclusion of the exterior search, Cpl. Anthony DOBLOVOSKY advised that Molly alert/indicated to the presence of controlled substances in the video.

(Doc. 43-3 at 2-3.)

After the warrant was signed, Macmillan and other PSP troopers

conducted the search and recovered, among other items, the following: the rental

agreement for the Hyundai Santa Fe; receipts; a Hilton hotel key; two cellular

phones; and a pair of Jordan Craig camo jeans. (Doc. 43 at 17.) Inside said jeans

approximately $2700 in cash and a plastic bag containing approximately a quarter

kilogram of a white substance was found. (*Id.*) The government notes that

> [t]he recovered white substance was analyzed at the PSP Wyoming Regional Laboratory and was found to weigh approximately 247.59 grams and contain cocaine, a Schedule II controlled substance. The street value of this amount of cocaine ranges from $7000-$8000 when sold wholesale and $10,500-$12,500 when packaged in 3.5g "eight balls" for distribution, depending on the exact location of the sale.

(Doc. 43 at 17 n.20.)

The Pennsylvania State Police subsequently charged Hawari-Rasulullah in state

court with Flight to Avoid Apprehension (18 Pa. C.S.A. § 5126), two counts of Aggravated

Assault (18 Pa. C.S.A. §§ 2702(a)(1) and (a)(3)), Person Not to Possess/Firearms (18 Pa.

C.S.A. § 6105(a)(1)), Simple Assault (18 Pa. C.S.A. § 2701(a)(1)), Reckless Endangering

Another Person (18 Pa. C.S.A. § 2705), and Resisting Arrest (18 Pa .C.S.A. § 5104).

The case was later adopted for federal prosecution.  On March 16, 2021, a federal grand jury sitting in Scranton, Pennsylvania, returned a three-count indictment charging Rashawn Hawari-Rasulullah with Possession with Intent to Distribute a Mixture or Substance Containing a Quantity of Cocaine, in violation of Title 21, United States Code, Section 841(a)(1), Possessing a Firearm, namely a .380 Cobra FS380, S/N FS112393, in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, in violation of Title 18, United States Code, Section 924(c), and Felon in Possession of a Firearm, in violation of Title 18, Section 922(g)(1).  (Doc. 1.)

### III. ANALYSIS

In his supporting brief, Defendant first asserts that the Court should schedule a hearing to determine whether the government can satisfy its burden of showing that Trooper Nowicki's warrantless seizure of Mr. Hawari-Rasulullah complied with the Fourth Amendment.  (Dc. 41 at 4.)   He then posits that the Court should schedule a hearing to determine the application of the exclusionary rule to tangible evidence and statements obtained by the PSP after Trooper Nowicki's initial warrantless seizure.  (*Id.* at 7.)  Finally, Defendant maintains that the Court should schedule a hearing to determine whether the Application for Search Warrant on November 22, 2020, contained materially false statements or omissions, knowingly or recklessly made.  (*Id.* at 10.)

As noted above, the Court has scheduled an evidentiary hearing but must make a preliminary determination regarding statements made in, or omitted from, the Search

Warrant's Affidavit of Probable Cause which Defendant alleges entitle him to a *Franks*

hearing. Therefore, the only issue addressed in this Memorandum Opinion is whether

Defendant is entitled to a hearing on the claimed improprieties in the Search Warrant

Application's Affidavit of Probable Cause.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the United States Supreme Court held

that

> where the defendant makes a substantial preliminary showing that a false
> statement knowingly and intentionally, or with reckless disregard for the truth,
> was included by the affiant in the warrant affidavit, and if the allegedly false
> statement is necessary to the finding of probable cause, the Fourth Amendment
> requires that a hearing be held at the defendant's request. In the event that at
> that hearing the allegation of perjury or reckless disregard is established by the
> defendant by a preponderance of the evidence, and, with the affidavit's false
> material set to one side, the affidavit's remaining content is insufficient to
> establish probable cause, the search warrant must be voided and the fruits of
> the search excluded to the same extent as if probable cause was lacking on
> the face of the affidavit.

*Franks*, 438 U.S. at 155–56. Thus, *Franks* established a two-part test to allow a defendant

to overcome the presumption that an affidavit of probable cause supporting a search

warrant is valid. *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). First, a criminal

defendant must make a "substantial preliminary showing" to overcome the presumption that

the affidavit supporting the search warrant is valid. *Id*. Only if this initial showing is made is

a defendant entitled to a *Franks* hearing. *Id.*

*Franks* elucidated the initial showing required:

> To mandate an evidentiary hearing, the challenger's attack must be more than
> conclusory and must be supported by more than a mere desire to cross-

examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient . . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Franks*, 438 U.S. at 171-72.  To overcome the presumption of validity, a defendant must do more than construct a self-serving statement which refutes the warrant affidavit.  *Id.* at 171. *United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984); *see also United States v. Strube,* No. CR.1:97-CR-0108-02, 1997 WL 33482969, at *3 (M.D. Pa. July 24, 1997) (supporting statements from the defendant and his wife self-serving).

In determining whether a statement was recklessly made,

the rule is that an assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported. This definition provides two distinct ways in which conduct can be found reckless: either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind.

*United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (internal citations and quotation marks omitted).  Similarly, omissions are made with reckless disregard for the truth "if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'"  *Wilson v. Russo*, 212 F.3d 781, 788

13

(3d Cir. 2000) (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)). An omission or assertion is "material" when "probable cause does not exist under the corrected affidavit." *Yusuf*, 461 F.3d at 383.

In sum, a defendant must "allege with specificity what was false in the affidavit, must provide proof, must allege that the affiant had a culpable state of mind, and must allege that the remaining information is insufficient to support a finding of probable cause." *United States v. Yokshan*, 431 F. App'x 170, 173 (3d Cir. 2011) (citing *Franks*, 438 U.S. at 171-72).

In the section of his brief in which he addresses the *Franks* issue, Defendant relies on his own declaration, the "Declaration of Defendant Rashawn Hawari-Rasulullah," attached to his Motion. (Doc. 41 at 11 (citing Doc. 40-3).) Thus, to determine if Defendant has made the requisite preliminary showing, the Court will review the allegations and proof contained in Defendant's Declaration.

The Declaration first states that that

[t]he affidavit includes the assertion that I was stopped because of "traffic violations," but I do not believe that I violated any rules of the road, and thus do not believe that any such violations were observed. Officers of the PSP were at least reckless in stating otherwise in the affidavit.

(Doc. 40-3 ¶ 5.) This conclusory statement falls far short of making the requisite showing. Defendant's "belief" that he did not violate any traffic rules is contradicted by Nowicki's MVR and Pennsylvania statute. MVR1 clearly shows Defendant travelling in the left lane with no traffic in the right lane, a violation of 75 Pa. C.S. 3301(a). *See supra* p. 3. MVR1 also shows Nowicki informing Defendant of the reason for the stop. *Id.* Therefore, Defendant's

14

allegation that the assertion in the Affidavit was made recklessly is merely a self-serving statement that does not satisfy the required proof to show entitlement to a *Franks* hearing.

Defendant next asserts that the Affidavit's statement that "[f]urther indicators of criminal activity were developed," was recklessly made in that the examples given of such conduct "were viewed as such only because I am a 38-year-old black American male or otherwise fail to support any reasonable inference of ongoing criminal conduct." (Doc. 40-3 ¶ 6.)  Defendant identifies six specific aspects of the Affidavit that are inaccurate identifiers of criminal activity. (*Id.*)

First, Defendant cites the Affidavit's statements regarding Defendant's "strong . . . reaction" to law enforcement presence and nervousness when asked about weapons and drugs. (*Id.* ¶ 6(a).)  He states that he did not have the observed reactions and, alternatively, if he did, the reaction would be justifiable for a "law-abiding black American male." (*Id.*)

Defendant's denial of the observed state and alternative justification for it do not undermine the asserted observations.  Even if Nowicki and Macmillan wrongly assessed Defendant's reactions at certain times, Defendant does not provide any support for a conclusion that the assertions were recklessly made as the Third Circuit has defined that term.  *See Brown*, 631 F.3d at 645.  Defendant has not shown that the affiant actually entertained serious doubts about the statements or that obvious reasons existed for him to do so.  *Id.*  Although the statement about Defendant's initial reaction to law enforcement's presence cannot be assessed because it was Nowicki's observation relayed to Macmillan

15

and was not recorded on MVR1, Defendant must provide more than a self-serving,

conclusory statement to overcome the presumption of validity. *Yusuf,* 461 F.3d 374, 383

(3d Cir. 2006). Information received from other law enforcement officials during the course

of an investigation is generally presumed to be reliable. *Id.* at 385 (citing *United States v.*

*Ventresca,* 380 U.S. 102 (1965) ("Observations of fellow officers of the Government

engaged in a common investigation are plainly a reliable basis for a warrant applied for by

one of their number."); *United States v. Hodge,* 246 F.3d 305, 311 (4th Cir.2004)

([S]tatements of other law enforcement officers 'are plainly ... reliable' even without any

special showing.") (citation omitted); *United States v. Meade,* 110 F.3d 190, 193 (1st

Cir.1997) ("[L]aw enforcement officials cooperating in an investigation are entitled to rely

upon each other's knowledge of facts when forming the conclusion that a suspect has

committed or is committing a crime."); *United States v. Davis,* 557 F.2d 1239, 1247 (8th

Cir.1977) (finding that a DEA agent was entitled to rely upon information provided to him by

a Minneapolis police officer in submitting an affidavit for probable cause)).

Defendant's attempt to undermine assertions in the Affidavit about Defendant

traveling on a known drug corridor from a known source drug area to another known source

drug area also fails. (Doc. 40-3 ¶ 6(b).) These facts are recognized as factors which can

contribute to reasonable suspicion that illegal activity had occurred or was occurring such

that a traffic stop may be extended. *See, e.g., United States v. Robinson*, 529 F. App'x 134,

138 (not precedential) (3d Cir. 2013) (factors justifying extension of traffic stop include

prevalence of drug trafficking along route of travel); *United States v. Meran*, Crim. No. 16-222, 2017 WL 4803927, at *3 (W.D. Pa. Oct. 23, 2017) (Interstate 80 often used for transporting drugs; New York City major source area for drugs); *United States v. Travis*, 837 F.Supp. 1396 (E.D. Ky. 1993) (Cleveland known for drug distribution).  Therefore, the inclusion of the information in the Affidavit of Probable Cause as indicators of criminal activity cannot be considered false or reckless.

Defendant next takes issue with the inclusion of the fact that he was driving a rental car as an indicator of criminal activity, again stating that it is only suspicious because he is a 38-year-old black male.  (Doc. 40-3 ¶ 6(c).)  Driving a rental vehicle is another factor which can contribute to reasonable suspicion that illegal activity has occurred or is occurring. *Robinson*, 529 F. App'x at 138.  Although not included in the Affidavit, in this case, the validity of the factor is heightened because MVR1 indicates that Nowicki's suspicion was heightened when Defendant hesitated to identify the rental car company, did not have the rental agreement or any related paperwork regarding the rental, and contradicted himself in first identifying the renter as his brother and later as a close friend.  *See supra* pp. 4-5. Thus, the inclusion of the rental vehicle as a factor leading to suspicion of criminal activity cannot be considered false or reckless.

Regarding the lack of luggage as an indicator of criminal activity, Defendant points to the bag containing clothes and toiletries in the front seat.  (Doc. 40-3 ¶ 6(d).)  The existence of the bag referenced by Defendant is not supported by any evidence other than

Defendant's self-serving assertion which is an insufficient offer of proof.  (*See* Doc. 43-4 at

4.)  Clearly, this is not enough to show that the statement, if false, was knowingly or

recklessly made.  This is particularly so because no "bag containing clothes and toiletries" is

listed on the Receipt/Inventory of Seized Property.  (*See* Doc. 43-3 at 4.)  Rather, the

document indicates that a pair of "Jordan Craig camo jeans size 32/32" and a "plastic bag

from [the jeans]" was seized.  (*Id.*)  No travel bag, toiletries, or other clothing is inventoried.

(*Id.*)

Defendant's criticism of the Affidavit's notation of Macmillan's detection of a "strong

odor of scent masking agent" (Doc. 40-3 ¶ 6(e)) does not identify a false statement

knowingly or recklessly made but simply points to explanation for the scent which would not

relate to criminal activity-- either the "familiar new vehicle scent" or the Indian food that he

had in the vehicle (*id.*).  While a source identified by Defendant could have been in play, the

*familiarity* of the new vehicle scent would be unlikely to be identified as a masking agent.

Further, regarding the fact that Macmillan could have smelled Indian food, Defendant does

not show how the scent emanating from such food could not be considered a masking

agent such that Macmillan's observation was wrong and knowingly or recklessly made.

Defendant's final example of a knowing false statement or omission regarding

indicators of criminal activity--"that I 'fled the scene of the traffic stop after being requested

for consent to search' the Santa Fe'" (Doc. 40-3 ¶ 6(f))--is also without merit.  Defendant

asserts that the following information was omitted from the statement: "that I entered the

vehicle to retrieve a jacket; that Trooper Nowicki entered the vehicle and forcefully applied his hands to my upper body; and that he reached for his firearm." (*Id.*)   After viewing MVR1, Defendant's assertions on this issue are a flagrant misrepresentation of the observable chain of events, a chain which is accurately depicted in the Affidavit.  It was after Defendant refused consent to search that he went toward the driver's door allegedly to retrieve his jacket and was instructed by Nowicki to wait and not enter the vehicle.  *See supra* p. 5. Defendant did not comply.  While leaning into the vehicle, Nowicki stated "yeah, you're going to step out with me" followed by repeatedly yelling, with increasing intensity, "don't do it!"  *Id.* (citing MVR1 10:45).  With an obvious scuffle occurring in the front seat, Defendant's vehicle moved forward, veered off the road and down an embankment, and came to rest in a wooded area at the bottom of the hill.  *See supra* p. 6 (citing MVR1 10:48-11:00).  In this scenario, there is no omission of *material* fact on this issue.  Defendant was told not to go into the car and that Nowicki would get the jacket, yet Defendant got into the car and did not comply with Nowicki's directive to get out of the car.  *See supra*.  Thus, Nowicki's forceful application of his hands to Defendant's upper body and reaching for his firearm do not undermine the fact that Defendant fled the scene.

Importantly, Defendant does not take issue with the Affidavit's recitation of related events:

> the operator walked to the driver's side of the vehicle and got back in the car, Trooper NOWICKI followed and attempted to get the operator back out of the vehicle.  The operator did not follow Trooper NOWICKI's orders and subsequently he put the car into drive and accelerated westbound along the

berm of Interstate 80 at a high rate of speed.  Trooper NOWICK was partially in the vehicle when the operator attempted to flee.  The vehicle left the Interstate, traveled down the embankment and into the wooded are to the north of the interstate, coming to a final rest in the woods.

(Doc. 43-3 at 2.)  Given this unchallenged recap of the events of November 22, 2020, Defendant's assessment of material omissions from the narrative his flight is disingenuous at best.

Defendant's criticism of the Affidavit's summary of events regarding the statement that Defendant "refused to remove" his hands from under him hinges on the assertion that Defendant was unable to move his hands.  (*See* Doc. 40-3 ¶ 7.)  Whether Defendant would not or could not move his hands is not material in that MVR1 clearly shows two and then three troopers trying to subdue Defendant and Defendant repeatedly being told to "stop resisting"--a struggle accurately documented in the Affidavit.  (MRV1 11:05-11:30; Doc. 43-3 at 2.)  Notably, but for the hand comment, Defendant does not take issue with the recitation of events related to the time after the vehicle came to rest and he was placed in handcuffs.

Regarding the discovery of a handgun at the scene and Defendant's assertion that he did not see a handgun in the location where it was retrieved (Doc. 40-3 ¶ 8), what Defendant saw or did not see when he was being held facedown in a location does not amount to anything more than a self-sreving, conclusory attack on PSP assertions regarding the handgun which is insufficient under *Franks* and its progeny to satisfy his burden of showing that a statement was knowingly or recklessly false.

Defendant's criticism of the Affidavit regarding the canine sweep (Doc. 40-3 ¶ 9) is similarly without merit in that it is based on what he does not know and no authority suggests that a lack of knowledge regarding an asserted fact is sufficient to show that a statement is materially false and was knowingly or recklessly made.  Defendant maintains that he sought discovery related to the canine sweep of the video and has not received all he requested, specifically an audio/video recording of the sweep.  (*Id.*)  Defendant acknowledges that he has received relevant documents but alleges that what he has received is insufficient, stating that "[i] n the absence of additional items responsive to my request, I must assume that the canine did not indicate/alert to controlled substances and/or the canine is not reliable, and that officers of the PSP were at least reckless in stating or suggesting otherwise in the affidavit." (*Id.*)   Defendant's statement on this issue, as with many statements in his Declaration, demonstrates either a fundamental lack of understanding or disregard for the preliminary showing required under *Franks*.  As set out above, *Franks* established a two-part test to allow a defendant to overcome the presumption that that an affidavit of probable cause supporting a search warrant is valid, particularly where the information is from law enforcement officials.  *Yusuf*, 461 F.3d at 383, 385. Defendant ignores this presumption and proceeds on what appears to be "a mere desire to cross examine" which *Franks* specifically disallowed. 438 U.S. at 171.

The foregoing review of the claimed material falsehoods or omissions shows that Defendant has provided no basis for entitlement to a *Franks* hearing.[5] Defendant's assertions of material falsehoods or omissions are totally devoid of the required support.

## IV. CONCLUSION

For the foregoing reasons, Defendant's request for a *Franks* hearing will be denied. Therefore, the February 17, 2022, evidentiary hearing will address only Defendant's claims that his seizure by Trooper Cody Nowicki was illegal under the Fourth Amendment and all evidence subsequently seized must be suppressed as fruits of the illegal conduct. A separate Order will be entered.

Robert D. Mariani
United States District Judge

---

[5] In his reply brief, Defendant seeks to amend his Declaration to add a tenth paragraph. (Doc. 49 at 5 n.2.) Amendment of a document in a reply brief is improper. "A reply brief is not the appropriate forum in which to raise new issues and the court need not address issues raised for the first time therein." *Bell v. Lackawanna Cty.*, 892 F. Supp. 2d 647, 688 n.41 (M.D. Pa. 2012); *see also United States v. Martin*, 454 F. Supp. 2d 278, 281 n.3 (E.D. Pa. 2006) ("A reply brief is intended only to provide an opportunity to respond to the arguments raised in the response brief; it is not intended as a forum to raise new issues."). However, if the Court were to consider this attempted amendment, the Court notes that it does not indicate that the new declaration is related to the Affidavit. Therefore, it is not related to Defendant's claimed entitlement to a *Franks* hearing.