THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,          :
                                   :
        v.                         :   3:21-CR-66
                                   :   (JUDGE MARIANI)
RASHAWN HAWARI-RASULULLAH,          :
                                   :
        Defendant.                 :

### MEMORANDUM OPINION

#### I. INTRODUCTION

Here the Court considers Defendant Rashawn Hawari-Rasulullah's Motion to

Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States

Constitution (Motion for Hearing) (Doc. 40) filed on September 9, 2021.  Defendant is

proceeding *pro se* in this matter.  (*See* Doc. 31 at 1.[1])  Both Defendant and stand-by

counsel filed declarations in support of the Motion.  (Docs. 40-3, 40-4.)

The event at issue occurred at approximately 9:00 a.m. on November 22, 2020,

when Pennsylvania State Police Trooper Kody Nowicki ("Nowicki") stopped Defendant's

vehicle on Interstate 80 westbound in Monroe County, Pennsylvania.  (Doc. 40-3 ¶¶ 2-3;

Doc. 43 at 3.)  The stop, which Nowicki informed Defendant was based on driving in the left

lane and exceeding the speed limit (Doc. 40-3 at 5; Doc. 43 at 5), led to Defendant's arrest,

---

[1] Having conducted a hearing in accordance with *Faretta v. California*, 422 U.S. 806 (1975), on
August 12, 2021, by Order of August 13, 2021, the Court granted Defendant's request to represent himself
and appointed Attorney Elliot A. Smith from the Office of the Federal Public Defender as stand-by counsel
to assist Defendant in all matters pertaining to this action.  (Doc. 31 at 1.)

the issuance of a search warrant to search the vehicle, and subsequent indictment on drug and weapons charges (Doc. 1).

Defendant alleges that his seizure by Nowicki was illegal under the Fourth Amendment and all evidence subsequently seized must be suppressed as fruits of the illegal conduct. (Doc. 41 at 4-9.) Defendant further asserts that the information contained in the warrant pursuant to which his vehicle was searched contained materially false statements or omissions, knowingly or recklessly made. (*Id*. at 10-11.)

With the filing of Defendant's reply brief (Doc. 49) on November 12, 2021, the pending motion was fully briefed (Docs. 41, 43, 49). By Order of November 17, 2021, the Court scheduled an evidentiary hearing for February 17, 2022, at 10:30 a.m. (Doc. 50.) With the Memorandum Opinion and Order of February 8, 2022, the Court made the preliminary determination that Defendant had not shown entitlement to a hearing regarding the warrant because he did not show that the warrant contained materially false statements or omissions. (Docs. 53, 54.) Therefore, the scheduled hearing was limited to Defendant's claims that his seizure by Nowicki was illegal under the Fourth Amendment and whether all evidence subsequently seized must be suppressed as fruits of the illegal conduct. (Doc. 54 ¶ 2.)

The hearing was held over three days—February 17, 2022, March 14, 2022, and March 22, 2022. At the close of the hearing, Defendant expressed that he wanted to file a post-hearing brief. (Hr'g Tr. Day 3 106:18-107:5, Doc. 72.) The Government requested two

weeks to respond.  (*Id.* 107:11-12.)  The Court determined that Defendant would have two weeks from the filing of the hearing transcript to file his brief and the Government would have two weeks after that to respond.  (*Id.* 107:35-108:2.)  After several extensions, Defendant filed his post-hearing brief on June 27, 2022.  (Doc. 84.)  After being granted an extension of time, the Government filed its post-hearing brief on August 8, 2022.  (Doc. 87.)

For the reasons that follow, the Court concludes that Defendant's motion is properly denied.

## II. Factual Background[2]

As noted above, the event giving rise to this action began at approximately 9:00 a.m. on November 22, 2020, when Pennsylvania State Police ("PSP") Trooper Kody Nowicki ("Nowicki") stopped Defendant's vehicle, a silver Hyundai Santa Fe, on Interstate 80 westbound in Monroe County.  Nowicki testified that he was then stationary at approximately milemarker 291.7 facing westbound traffic on Interstate 80.  (Hr'g Tr. Day 1 21:16-17, Doc. 64.)  He said he was located between three to five feet from the white line of the roadway and there was nothing between his car and that point.  (*Id.* 22:19-22.)  The speed limit in that area was 65 miles per hour, and Nowicki assessed the traffic to be moderate for a Sunday.  (*Id.* 22:1-3, 23-24.)

---

[2] The Court bases the factual background on the "Mobile Video Recorder" (commonly referred to as "MVR" or "dash-cam") footage of the events of November 22, 2020, (Government's Exhibits 1-3; Defendant's Exhibit B), the parties' briefs, and hearing testimony.

After Government counsel asked what he recalled seeing at that date and time, the

following exchange occurred:

A. . . . [S]pecifically, in the left-hand lane approaching my stationary position, I observed a silver Hyundai SUV traveling at what appeared to be above the posted speed limit.

Q. How did you conclude that?

A. Just based upon how many vehicles I see, it kind of becomes easy to tell if somebody is traveling in excess of the speed limit. I didn't have a radar unit, but he appeared to be traveling over the speed limit. When he observed my stationary position -- when the suspect vehicle observed my stationary position, I observed the front end to dip down towards the roadway, which is an indication that whoever was driving that vehicle activated its brakes, once it saw my position.

Q. Were there other cars on the road, when you saw this Hyundai Santa Fe?

A. There were other cars on the road, I do not recall if he was the only one in my field of view, at that point.

Q. Well, there was no cars between you and that car, when you first saw it?

A. No, sir, there was not.

Q. What other observations did you make about that Hyundai Santa Fe from your parked position?

A. When the vehicle passed me, I observed what appeared to be an air freshener hanging from the rear-view mirror. I then observed what appeared to be a non-smoking sticker on the driver's side window down at the bottom right-hand corner of it, and then I observed what appeared to be a male operating that motor vehicle. The male was tucked back and seated back behind what would be considered the B pillar, so I wasn't able to actually see if it was a male, but based on the stature, I made the assumption it was a male operator.

Q. Did you observe anything else about that operator's face or appearance?

4

A. I wasn't able to identify him, I wasn't able to see him, he was so far back behind the B pillar, I wasn't able to identify him, no.

Q. Was there anything about that operator's situation, within the vehicle, which alerted you?

A. He appeared to try to conceal himself a little further behind that B pillar, but that was the only thing was just he was attempting to conceal himself behind the B pillar.

Q. Is that common?

A. It's not common. You sometimes see that on the interstate, when someone is nervous about your presence, they'll attempt to conceal themselves to try to hide in plain view.

Q. You mentioned a sticker. I'm sorry, which window was that on?

A. That was on the driver window located, if you're looking at the window, the bottom right portion of that window.

Q. When you're looking at the window from the outside?

A. Looking at the window from the outside, yes.

Q. What was significant about that sticker to you?

A. Based upon my training and experience, seeing that sticker, that is, typically, common with rental vehicles, and seeing the air freshener inside that vehicle is not common with rental vehicles, that immediately caught my attention.

Q. Why did that catch your attention?

A. Rental vehicles are always clean, they're always upkept, always smell good, so putting a masking agent inside a rental vehicle is something extra you need to go out of your way to do, it's just not common.

Q. With your time at P.S.P., are you familiar with rental cars or rental vehicles?

A. Yes, I am.

Q. What, in your training and experience, have you learned about rental vehicles as a Trooper at P.S.P.?

A. Rental vehicles are commonly and typically used by DTO's, drug trafficking organizations, they're commonly used by them because they're reliable. They get you from point A to point B, you don't have to worry about them breaking down or anything like that, they're typically well-maintained and well-kept. They blend in with traffic, as well, and they give the operatora built in defense for it, as well.

Q. Can you explain that?

A. Operators will typically say, Oh, this is a rental, I don't know what's in it, I'm not aware what's in it, so they attempt to use that as a built-in defense for that.

Q. While the vehicle, the Hyundai Santa Fe passed you, was your MVR on at that time?

A. It wasn't.

Q. What did you do after it passed you?

A. After it passed me, when it was safe to pull out, I pulled out into the left-hand lane of Interstate 80 and I attempted to catch up with the suspect vehicle.

Q. After pulling out, at some point, did you turn or activate your MVR dash cam?

A. Yes, once I was able to regain sight of the suspect vehicle.

Q. Did you lose site of the suspect vehicle, when you pulled out?

A. I did, for a portion of the time. After it passed my location, it becomes a, kind of, right hand curve, in a way, and I did lose the suspect vehicle, just based upon traffic, I wasn't able to immediately pull out on that vehicle.

Q. Approximately, how long did you lose site of that vehicle?

A. Maybe for a quarter to half mile distance, I'm not sure of the time, but it wasn't for very long.

(Hr'g Tr. Day 1 23:2-26:24, Doc. 64.)

Before stopping Defendant's vehicle, Nowicki's MVR shows the vehicle traveling in the left lane with no vehicles or obstructions in the right lane. (Nowicki MVR ("MVR1") :45-1:00.[3]) Nowicki testified that he followed the vehicle for approximately two miles, approximately a mile and a half from where he first saw the vehicle it was still traveling in the left lane with the right lane open (a violation of Section 3313(d) of Title 75), and he was calling that out on the MVR which has an audio component. (Hr'g Tr. Day 1 30:6-14, 31:16-18, 25, Doc. 64.) Nowicki explained that before he activated his lights and siren he called out the vehicle's speed to be 76 miles per hour. (*Id.* 30:24-31:5.) Nowicki explained his calculation of the vehicle's speed: "I was traveling at a rate of 76 miles per hour, I wasn't gaining any distance and I wasn't losing any distance, so the suspect vehicle's speed was traveling at a rate of 76 miles per hour, as well." (*Id.* 31:7-10.) Before he stopped the vehicle, Nowicki also called out the description of the vehicle and the plate number. (*Id.* 32:25-3.)

---

[3] Time indicated is that identified in the MVR, i.e., elapsed time from when the recording began. Defendant notes that he does not stipulate to the authenticity of the video recording. (Doc. 41 at 2 n.1.) Because Defendant objects only to the characterization of events which are shown on the MVR (*see, e.g.,* Doc. 40-3, Doc. 41 at 1-3, Doc. 49 at 1-5), the Court's background recitation properly includes facts observed on Nowicki's MVR which will be cited as "MVR1."

After the vehicle came to a stop on the shoulder of the highway, Nowicki exited his car and approached the passenger side of Defendant's vehicle, shining a flashlight in the tailgate window as he went by. (MVR1 2:45.) Nowicki explained that he went to the passenger side because it's safer to do so on an interstate and the vehicle had parked very close to the white line. (Hr'g Tr. Day 1 35:10-13, Doc. 64.) Before interacting with Defendant, Nowicki observed there to be nothing in the trunk and back seat of the vehicle—the only things he observed were a medium-sized plastic-type bag on the passenger side seat, a "dark-colored, tree-shaped masking agent air freshener, and . . . a very strong odor of a masking agent inside the vehicle." (*Id.* 35:25-14.)

Nowicki's recorded interaction with Defendant begins with Nowicki introducing himself and informing Defendant that he was being stopped because he was driving in the left lane and slightly exceeding the speed limit. (MVR1 2:55.) After being asked for his license, registration, and proof of insurance, Defendant produced a scanned paper copy of his operator license number and informed Nowicki that it was a rental car but he had left the rental agreement at his house in Cleveland and he had no registration or insurance information. (Hr'g Tr. 38:13-21; MVR1 3:11.) When asked about the specific rental company, Defendant did not immediately answer but, after a delay, identified Dollar as the rental company. (MVR1 3:55-4:10.) Questions about who had rented the car followed. (MVR1 4:11.) Defendant said his "bro" had rented the car and, when Nowicki sought

confirmation that it was his "brother," Defendant confirmed that it was his brother.  (MVR1 4:14.)

Nowicki then commented that it was cold, asked Defendant if he had a jacket, and Defendant responded that he did not.  (MVR1 4:20.)  Shortly thereafter, Nowicki asked Defendant to come back to his vehicle, adding "I will try to get you out of here as soon as possible with a warning, ok?"  (MVR1 4:25-28.)  Defendant agreed by saying "ok."  (MVR1 4:28.)  Nowicki then moved to the driver side of Defendant's vehicle and, while standing in the right lane of interstate travel, briefly placed his hand on the door.  (MVR1 4:38.)  When Defendant asked about this at the hearing in the context of whether Nowicki had requested or ordered him to get out of the vehicle ("If it's a request, why are you grabbing for the handle of the door to pull the door open?" (Hr'g Tr. Day 2 83:25-84:1, Doc. 69)), Nowicki responded "I wanted to spend as less time in the lane of travel as I possibly could."  (*Id.* 84:2-3.)

Before getting out of the vehicle, Defendant asked Nowicki about whether to turn the engine off and Nowicki said he was not making him turn it off.  (Hr'g Tr. Day 1 44:5-9, Doc. 64; MVR1 4:33.)  Defendant left the vehicle running.  (Hr'g Tr. Day 1 44:10-13, Doc. 64.)  As Defendant exited his vehicle, Nowicki asked "no weapons on you or anything like that?" to which Defendant responded "no."  (MVR1 4:46.)  When Defendant got out of the vehicle, he began to take a step toward the patrol car at which point Nowicki's left hand momentarily touched Defendant's right wrist as Nowicki asked "Do you mind if I just pat you down real

quick?" (MVR1 4:48-50.)  Defendant said "no" as he slightly raised his arms to facilitate the

pat down.  (*Id.*)  After a brief pat down of the waist area, Nowicki and Defendant proceeded

toward the patrol vehicle.

> Nowicki testified that he asked Defendant to come back to his vehicle

> [s]ince the Defendant didn't have a Government I.D. on him, he didn't have the
> registration, he didn't have the insurance, and based upon pre-stop indicators,
> I wanted the suspect -- I'm sorry -- I wanted the Defendant to exit the suspect
> vehicle and come back to my vehicle, just in case I had any required questions
> about the vehicle or about his license, since he didn't have the actual
> Government copy, and I could not positively identify him at that part.

(Hr'g Tr. Day 1 45:17-24, Doc. 64.)

> Nowicki further explained that at this point he was in the car:

> conducting a records check on, again, the registration to ensure that it had valid
> insurance, a query of the Defendant's license to ensure that he had a valid
> driver's license, and that that, in fact, was the Defendant, and it wasn't a false
> identification.

(*Id.* 46:9-13.)

What follows is audio where electronic noises can be heard, Defendant is standing

by the passenger door, and Nowicki is in the car making small talk and asking questions

about Defendant's travel.   (MVR1 5:22.)  In response to questions asked while Nowicki was

conducting the document inquiries, Defendant said that he stayed with family around

JFK/Queens.  (MVR1 7:15.)   Nowicki asked additional questions about travel and found

Defendant's answers vague.  (Hr'g Tr. Day 1 50:7, Doc. 64.)  Nowicki testified that during

this phase of the stop typically people have their nervousness diminish but Defendant's

nervousness increased.  (*Id.* 50:11-16, 51:24-25.)  Based on these indicators, Nowicki found

some answers to be dishonest.  (*Id.* 51:8-9.)  Nowicki also asked Defendant if he has ever

been in legal trouble, and Defendant responded that he had a situation trying to get custody

of his young daughter.  (MVR1 8:00.)  Nowicki testified that his question about criminal

history was a "control question."  (Hr'g Tr. Day 1 52:9-11, Doc. 64.)   He added that

> I had already ran his criminal history at this portion of the traffic stop. I knew
> and had the correct and factual knowledge as to what his history showed, I
> wanted to ask the Defendant to see how he answered and if he would be
> truthful or not and base that off his other questions that he previously answered.

(*Id.* 52:11-16.)  Defendant's criminal history showed "a recent arrest in Ohio for narcotics,

I'm not sure of the actual particulars of that case, but a recent narcotics arrest. There was,

also, a firearms arrest and a few other arrests that were not small, not minor things."  (*Id.*

52:21-23.)  Nowicki added that Defendant's response to his question about criminal history

showed deceitfulness.  (*Id.* 53:3.)

Nowicki again asked who rented the vehicle and Defendant responded that his close

friend did.  (MVR1 8:40.)  When asked why he did not rent the vehicle, Defendant replied

that he had spent the limit on his credit card.  (MVR1 8:50.)

Shortly thereafter, Defendant asked, "Do you mind if I sit down?" and Nowicki

responded, "No, you're good, yeah, you want to sit up there?"  (MVR1 9:45-48.)  Defendant

said "Yeah," and Nowicki followed up by saying "I'll come up, I'll come up."  (MVR1 48-50.)

Nowicki testified that Defendant's request coincided with his apparent observation of a

second police car arriving.  (Hr'g Tr. Day 1 56:11-13, Doc. 64.)  While Defendant is seen

walking to the driver's door of his car, Nowicki stopped at the tailgate and asked Defendant

to join him there because Nowicki wanted to ask a few questions.  (MVR1 10:00.)

Defendant joined Nowicki at the tailgate, and Nowicki asked him whether there was any

weapon in the car, followed by questions about whether specific controlled substances

(marijuana, heroin, methamphetamine, cocaine) were in the car.  (MVR1 10:05.)  In each

instance, Defendant answered in the negative.  (*Id*.)  Thereafter, Nowicki asked Defendant if

he had permission to search the car, and Defendant answered "no."  (MVR1 10:20.)

Nowicki testified that he asked these questions "[b]ased upon the indicators that I

saw, pre-stop, post-stop and during his interview, I believed that criminal activity was afoot,

and at that time, I believed that the Defendant's voyage was criminal in nature, and that the

suspect vehicle was containing something that was illegal."  (Hr'g Tr. 58:4-8.)  He further

explained what he meant by criminal indicators:

> The indicators of, again, the pre-stop, where he attempted to conceal himself
> behind the B pillar, the rental vehicle, as well, having the odor of the strong
> masking agent, his inability to, I guess, answer truthful to some questions. I
> observed indicators, while asking him questions that he should have known,
> like, who rented the vehicle, that answer changed more than once.
>
> And then, also, the fact that he was searching for an answer how long
> he stayed in New York, who he was visiting, later on, I believe, he related
> cousins, but, at first, he said his mother was sick with cancer or something
> along the lines of that, I don't exactly remember his exact words on that.
>
> All of those things combined led me to believe that after looking at the
> totality of the circumstances, that this traffic stop was more than just a traffic
> stop.

(Hr'g Tr. Day 1, 11-25, Doc. 64.)

Nowicki then again questioned Defendant about whether he had a jacket.  (MVR1

10:22.)  Defendant responded that he would get his jacket which he indicated was in the

car.  (*Id*.)  As Defendant continued to walk toward the driver-side door, Nowicki said he

would get the jacket, adding that he did not want Defendant "jumping in there."  (MVR1

10:26.)  Nowicki then said "wait, wait, wait" as Defendant proceeded to open the door.  (*Id*.)

Nowicki repeated that he would grab the jacket, but Defendant got into the car indicating the

jacket was "right there."  (MVR1 10:33.)  While leaning into the vehicle, Nowicki stated

"yeah, you're going to step out with me" followed by repeatedly yelling, with increasing

intensity, "don't do it!"   (MVR1 10:45.)  At this point on the MVR, another officer can be

seen walking toward the passenger side of Defendant's vehicle.  (MVR1 10:47.)

With an obvious scuffle occurring in the front seat, Defendant's vehicle moved

forward, veered off the road and down an embankment, and came to rest in a wooded area

at the bottom of the hill.  (MVR1 10:48-11:00.)  The second officer, PSP Trooper Jonathan

Lazarchick ("Lazarchick"), ran down the embankment.  (*Id*.)   After the car stopped, it

appears that Nowicki pulled Defendant out of the car and they both fell to the ground.

(MVR1 11:05.)

At about this time, another PSP vehicle arrived.  (MVR1 11:03.)   Lazarchick and the

third officer, PSP Trooper Thomas Rehberg ("Rehberg"), ran to assist Nowicki and an officer

can be heard yelling several times for Defendant to "stop resisting."  (MVR1 11:18.)   An

officer can also be heard telling Defendant to get his hands behind his back and "get your hand out" before Defendant was placed in handcuffs.  (MVR1 11:30.)

Nowicki then staggered up the bank and collapsed on the ground while another officer called for EMS.  (MVR1 12:00.)   After several more officers arrived, Defendant was escorted up the bank and left the scene.  (MVR1 17:50.)  Nowicki remained lying on the bank until the ambulance arrived.  (MVR1 21.00.)  At about this time, officers on scene photographed the site and appeared to comb the area of tall brush where Defendant's vehicle came to rest.  (MVR2 25:30.[4])  Several minutes later, an officer searching near the vehicle appeared to summon others.  (MVR2 32:00.)  When the officers disperse, one of them is carrying a large manilla envelope, the contents of which are unknown to the viewer. (MVR2 38:00.)

Nowicki explained what led up to the movement of the vehicle: while he was still outside the vehicle,

> Defendant did, in fact, grab a jacket, he grabbed it with his right hand, he kind of turned to me to present it to me, saying, Oh, here is my jacket. He asked me a question, and I believe it was something along the lines of, I'm not 100 percent sure, but something along the lines of, Do you need me to get out of the vehicle? He asked me a question, more specifically, about getting out of the vehicle. I said, Yes, you're going to get out with me. At that point, the Defendant put the jacket back on the passenger side seat, and as he was looking at me, he had, what I would describe as a flight or fight type of facial expression, type of how his demeanor was, he was either going to fight to get out of this or he was going to flight to get out of this.

---

[4] MVR2 is the Mobile Vehicle Recording from Trooper Lazarchick's vehicle.

Q. What did the Defendant do then?

A. The Defendant, as I was partially in -- as I was partially in between the rocker panel of the vehicle and the door that was still open, the Defendant picked up his right foot, that is the first time I yelled, Don't do it. I knew, once he picked up his right foot, his next step wasn't to get out of the vehicle, it was going to be to put it on the brake to try to get the vehicle into drive.

Q. So what were you instructing him not to do?

A. Not to put the vehicle in drive and put his foot on the brake.

Q. What did the Defendant do?

A. The Defendant put his foot on the brake and attempted to put the vehicle into drive.

        . . . .

        . . . [A]fter an altercation inside the vehicle, the Defendant was, ultimately, able to get the vehicle into drive, after he reached into the previously testified to plastic bag. I wasn't able to control the suspect, at that point, I was only attempting to control him with one hand, based upon how he was halfway in and halfway out of the vehicle.

Q. What was the Defendant doing with his hands?

A. The Defendant -- his left hand was on the steering wheel portion of the vehicle, his right hand moved to be from the shifter of the vehicle, which was located in between the driver's side and passenger side seat in front of the center console or behind the center console area, he moved his hands from there, his right hand, specifically, into the plastic bag.

Q. What were you doing with your hands?

A. At that time, my left arm was at the steering wheel portion of the suspect vehicle, I was mostly in the suspect vehicle, and I was trying to control the suspect's – the Defendant's right hand with my right hand. I was unsure what

he was grabbing, but based upon my training and experience, whatever he was grabbing was worth grabbing out of that plastic bag.

Q. At any point, was the Defendant able to place the car in drive?

A. Yes, after the Defendant removed his hand, again, I wasn't able to control the Defendant all the way, just based upon where I was situated outside and partially inside the vehicle. The Defendant was able to hit the gas, you saw, very briefly, a cloud of vapor or smoke come out, the vehicle was still in park, at that time, he thought he had gotten it into drive.

Q. Was he able to get it into drive?

A. Yes, he was ultimately able to get the vehicle into drive, when he got the vehicle into drive, he accelerated down the portion of the interstate.

Q. Where did that vehicle go?

A. For the Defendant's safety and my safety, the motoring public's safety, in my head, I knew that I had to steer the vehicle as far away from the interstate as possible. Again, this was a very, very short distance, a very, very short time, we were engaged in a physical altercation inside the vehicle, whether it was him or myself who steered the vehicle off the roadway, but, ultimately, the vehicle went off the roadway into the grassy portion of the interstate.

(Hr'g Tr. 63:24-67:23, Doc. 64.)

Trooper Ian Macmillan ("Macmillan") was assigned as the lead investigator of this incident.  (Doc. 43 at 14.)  At Macmillan's request, the PSP Drug Detection Canine Unit was called to conduct an exterior sweep of Defendant's vehicle.  (Doc. 43 at 14.)  PSP Corporal Anthony Doblovasky and canine Molly responded and conducted the requested sweep.[5]

---

[5] The record contains various spellings of Corporal Doblovasky's last name (Doblovsky, Doblovosky).  (See, e.g., Doc. 43 at 14; Doc. 43-3 at 3.)  The Pennsylvania State Police Fern Ridge Barracks confirmed that Doblovasky is the correct spelling.

(*Id*.)  The government asserts that Doblovasky advised Macmillan that Molly had alerted/indicated to the presence of controlled substances in the vehicle.  (*Id*.)

The government further asserts that, after viewing the MVR recordings and conducting interviews with Nowicki, Lazarchick, and Rehberg, Macmillan applied for a search warrant to search the interior of Defendant's vehicle.  (*Id.* at 15.)

After the warrant was signed, Macmillan and other PSP troopers conducted the search and recovered, among other items, the following: the rental agreement for the Hyundai Santa Fe; receipts; a Hilton hotel key; two cellular phones; and a pair of Jordan Craig camo jeans.  (Doc. 43 at 17.)  Inside said jeans approximately $2700 in cash and a plastic bag containing approximately a quarter kilogram of a white substance were found. (*Id*.)  The government notes that

> [t]he recovered white substance was analyzed at the PSP Wyoming Regional Laboratory and was found to weigh approximately 247.59 grams and contain cocaine, a Schedule II controlled substance. The street value of this amount of cocaine ranges from $7000-$8000 when sold wholesale and $10,500-$12,500 when packaged in 3.5g "eight balls" for distribution, depending on the exact location of the sale.

(Doc. 43 at 17 n.20.)

The Pennsylvania State Police subsequently charged Hawari-Rasulullah in state court with Flight to Avoid Apprehension (18 Pa. C.S.A. § 5126), two counts of Aggravated Assault (18 Pa. C.S.A. §§ 2702(a)(1) and (a)(3)), Person Not to Possess/Firearms (18 Pa. C.S.A. § 6105(a)(1)), Simple Assault (18 Pa. C.S.A. § 2701(a)(1)), Reckless Endangering Another Person (18 Pa. C.S.A. § 2705), and Resisting Arrest (18 Pa .C.S.A. § 5104).

The case was later adopted for federal prosecution.  On March 16, 2021, a federal grand jury sitting in Scranton, Pennsylvania, returned a three-count indictment charging Rashawn Hawari-Rasulullah with Possession with Intent to Distribute a Mixture or Substance Containing a Quantity of Cocaine, in violation of Title 21, United States Code, Section 841(a)(1), Possessing a Firearm in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, in violation of Title 18, United States Code, Section 924(c), and Felon in Possession of a Firearm, in violation of Title 18, Section 922(g)(1).  (Doc. 1.)

### III. ANALYSIS

In his post-hearing brief, Defendant maintains that the Government has not satisfied its burden of showing that one of the exceptions to the warrant requirement applies.  (Doc. 84 at 2.)  He also asserts that there were multiple infringements on his rights, including "(1) Initiation of Traffic Stop, (2) Aggressive E[s]corting motorist out of vehicle [sic], (3) Terry Frisk / Pat Down, (4) Unrelated inquiries, (5) Excessive force resulting in unlawful arrest."  (Doc. 84 at 2.)  The Government refutes these alleged infringements and concludes that Defendant's motion should be denied.  (Doc. 87 at 18-34.)

## A.  Initial Traffic Stop

Defendant contends that he committed neither a left-lane violation nor a speeding violation.  (Doc. 84 at 2-4.)  The Government maintains that Nowicki "clearly had a reasonable suspicion that a violation of the vehicle code was being committed and ,

accordingly, the initial traffic stop of the vehicle was proper." (Doc. 87 at 21.)   The Court

agrees with the Government's assessment of the initial stop.

The Fourth Amendment provides that individuals shall not be subject to

"unreasonable searches and seizures." U.S. Const. amend. IV. "The United States

Supreme Court has held that stopping a car and detaining its occupants is a seizure under

the Fourth Amendment." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

It is well-established that a police officer who observes a violation of state traffic laws

may lawfully stop the car that committed the violation. *Pennsylanvia v. Mimms*, 434 U.S.

106, 109 (1977). The stop is lawful if the police officer has a reasonable suspicion to

believe that a traffic law has been broken. *United States v. Delfin-Colina*, 464 F.3d 392, 397

(3d Cir. 2006). "Reasonable, articulable suspicion is a 'less demanding standard than

probable cause and requires a showing considerably less than preponderance of the

evidence.'" *Id.* at 396 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

"In forming a reasonable suspicion, officers may rely on their own experience and

knowledge." *United States v. Jones*, 506 F. App'x 128, 131 (3d Cir. 2012). "When

determining whether an officer possessed reasonable suspicion to conduct a traffic stop, [a

court] must consider the totality of the circumstances." *United States v. Lewis*, 672 F.3d

232, 237 (3d Cir. 2012). "A court should undertake an objective review of the officer's

rationale for the investigatory traffic stop. [*Whren v. United States*, 517 U.S. 806 (1996).]

That is, a court should only look to whether specific, articulable facts produced by the officer

would support reasonable suspicion of a traffic infraction. *Id.* at 808." *Delfin-Colina*, 464 F.3d at 397-98. However, "[w]here reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237 (citing *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010)).

Further, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact 'does not violate the Fourth Amendment.'" *Delfin-Colina*, 464 F.3d at 398 (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)); *see also United States v. Fleetwood*, 235 F. App'x 892, 895 (3d Cir. 2007) (noting that the standard for a traffic stop "is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts").

"[A] defendant who challenges a search or seizure typically bears the burden of proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Johnson*, 63 F.3d at 245. Here, because the seizure of Defendant occurred without a warrant, the Government bears the burden of showing that the seizure was reasonable. *See United States v. Clark*, 902 F.3d 404, 409 (3d Cir. 2018) (citing *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); *United*

*States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002); *Johnson*, 63 F.3d at 245) ("The

Government bears the burden of showing (and presenting evidence) that the traffic stop

was unreasonable").

The left-lane violation in this case is based on a claimed infraction of 75 Pa. C.S. §

3313 which addresses "Restrictions on use of limited access highways" and provides in

pertinent part as follows:

**(d) Driving in right lane.--**

(1) Except as provided in paragraph (2) and unless otherwise posted, upon all limited access highways having two or more lanes for traffic moving in the same direction, all vehicles shall be driven in the right-hand lanes when available for traffic except when any of the following conditions exist:

(i) When overtaking and passing another vehicle proceeding in the same direction.

(ii) When traveling at a speed greater than the traffic flow.

(iii) When moving left to allow traffic to merge.

(iv) When preparing for a left turn at an intersection, exit or into a private road or driveway when such left turn is legally permitted.

(2) Unless otherwise posted, no vehicle or combination over 10,000 pounds may be driven in the left-hand lane of a limited access highway having three or more lanes for traffic moving in the same direction except when preparing for a left turn at an intersection, an exit or into a private road or driveway when such left turn is legally permitted.

75 Pa. C.S. § 3313(d).

Regarding the speeding violation, 75 Pa. C.S. § 3362 addresses "Maximum speed

limits" and provides as follows:

**(a) General rule.--**Except when a special hazard exists that requires lower speed for compliance with section 3361 (relating to driving vehicle at safe speed), the limits specified in this section or established under this subchapter shall be maximum lawful speeds and no person shall drive a vehicle at a speed in excess of the following maximum limits:

   (1) 35 miles per hour in any urban district.

   (1.1) 65 miles per hour or 70 miles per hour for all vehicles on freeways where the department has posted a 65-miles-per-hour or 70-miles-per-hour speed limit.

   (1.2) 25 miles per hour in a residence district if the highway:

      (i) is not a numbered traffic route; and
      (ii) is functionally classified by the department as a local highway.

   (2) 55 miles per hour in other locations.

   (3) Any other maximum speed limit established under this subchapter.

75 Pa. C.S. § 3362(a).

Considering the left-lane violation, MVR footage shows that Defendant traveled in the left lane for an extended period with no vehicles and no visible obstructions in the right lane. *See supra* p. 7. Defendant states that "Nowicki testified that there was construction on the road." (Doc. 84 at 2 (citing T. Tr. Day 2 41:2-21, Doc. 69).) A review of Nowicki's testimony related to road construction indicates that Defendant's implication that the construction was relevant to the area of the roadway on which he was travelling is unsupported. Nowicki testified that he waited for a safe place to pull over after he caught up to Defendant and he specifically waited until he had passed a "Slow down, Construction" sign on the right side of the road. (Hr'g Tr. Day 2 41:11-15, Doc. 69.) Nowicki further

22

explained that there was construction on the road that was further westbound from where Nowicki had followed and stopped Defendant. (*Id.* 41:16-22.)

Relatedly, Defendant "declares that there was [sic] obstructions in the road that were felt, making it necessary to drive in the left lane for a short portion of the highway." (Doc. 84 at 3.)  Whether Defendant felt obstructions on the roadway is immaterial to the assessment of his claimed Fourth Amendment violation.  Relevant MVR footage does not show obstructions, *see supra* p. 7, and, if obstructions were not visible, Nowicki's reasonable suspicion of a left-lane violation would not be diminished.

Defendant also challenges Nowicki's assessment that he was speeding.  (Doc. 84 at 3.)  He claims that Nowicki's "certified speedometer is off by +1 mph" and calculates various speeds based on MVR footage ranging from 67 miles per hour to 83 miles per hour.  (*Id.*)  Notably all speeds calculated are above the posted speed limit of 65 miles per hour.  Thus, Defendant's attempts to undermine reasonable suspicion are unavailing.

As set out above, *see supra* p. 20, whether Defendant actually committed the violations identified by Nowicki is not the issue; the issue is whether Nowicki reasonably believed that a traffic violation had occurred.  *Delfin-Colina*, 464 F.3d at 397, 398; *see also Fleetwood*, 235 F. App'x at 895 ("no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts").  Based on the requisite "objective review of [Nowicki's] rationale for the investigatory traffic stop," the Court

23

concludes that the "articulable facts produced by [Nowicki] . . . support reasonable suspicion

of a traffic infraction." *Delfin-Colina*, 464 F.3d at 397-98.

## B. Extension of the Traffic Stop

Defendant contends that the stop violated his Fourth Amendment rights because it

was extended beyond a traffic stop. (Doc. 84 at 1.)  The Government responds that

Nowicki lawfully extended the stop. (Doc. 87 at 21.)  The Court concludes that Nowicki

permissibly extended the traffic stop.

The Court of Appeals for the Third Circuit recently discussed the permissibility of the

extension of a traffic stop in *United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022).  *Hurtt*

first noted that "[e]ven if an officer lawfully stops a suspect at first, 'it could become

'unreasonable,' and thus violate the Constitution's proscription [against unreasonable

searches and seizures], at some later time.'" 31 F.4th at 159 (quoting *Clark*, 902 F.3d  at

409). *Hurtt* then looked to the Supreme Court decision in *Rodriguez v. United States*, 575

U.S. 348 (2015), where

> the Court held that "a police stop exceeding the time needed to handle the
> matter for which the stop was made violates the Constitution's shield against
> unreasonable seizures." [575 U.S. at 350.] Thus, "a seizure justified only by a
> police-observed traffic violation, ... becomes unlawful if it is prolonged beyond
> the time reasonably required to complete the mission." [*Id.* at 350-51.]

*Hurtt*, 31 F.4th at 159.[6]

_____

[6] Citations footnoted in *Hurtt* are bracketed in this opinion.

"An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 355)). *Green* explained that, pursuant to *Rodriguez*, "we must first determine when the stop was measurably extended. . . . After determining when the stop was extended—the "*Rodriguez* moment," so to speak—we can assess whether the facts available to [the officer] at that time were sufficient to establish reasonable suspicion." *Id.* After the *Rodriguez* moment,

> "nothing later in the stop can inform our reasonable suspicion analysis." [*Green*, 897 F.3d at 182.] In short, we ask whether the mission of the traffic stop was continuously carried out before the discovery of evidence giving rise to a reasonable suspicion of criminality. Any break in that mission taints the stop because it is the result of an unreasonable delay. [*See, e.g.*, *Garner*, 961 F.3d at 271–72 (holding that there was no unlawful extension of the traffic stop because the officer "had reasonable suspicion to extend the stop based on information he obtained during the first few minutes of the traffic stop"); *Yoc-Us v. Att'y Gen.*, 932 F.3d 98, 105–06 (3d Cir. 2019) (holding that the officer was justified for first stopping the van for speeding but that it was an unlawful extension to investigate the immigration status of the passengers); *Clark*, 902 F.3d at 410–11 (questioning the passenger after receiving information from dispatch impermissibly extended the stop because the traffic stop's mission "to address the traffic violation that warranted the stop" was complete).]

*Hurtt*, 31 F.4th at 159.

Importantly, when it comes to inquiries unrelated to the traffic stop, "there is no *de minimus* exception to" the *Rodriguez* rule. *Clark*, 902 F.3d at 410 (citing *Rodriguez*, 575 U.S. at 357). In describing what inquiries qualify as unrelated to a traffic stop, *Rodriguez* noted that ordinary inquiries "involve checking the driver's license, determining whether

there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The Third Circuit has further held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *Clark*, 902 F.3d at 410). Directing a driver to get out of a vehicle is also acceptable. As stated in *Hurtt*,

> [w]hen evaluating whether an officer was on-mission, we consider the "'legitimate and weighty' interest in officer safety" and thus will tolerate additional intrusions, such as forcing a driver to get out of a vehicle. [*Rodriguez*, 575 U.S. at 356 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)).] This interest, "[u]nlike a general interest in criminal enforcement, ... stems from the mission of the stop itself." [*Id.*]

*Hurtt*, 31 F.4th at 159–60.[7]

––––––––––––––––––

[7] Pat down searches are treated differently from orders to get out of a vehicle. A police officer can conduct a limited protective search or frisk for weapons "where he has a reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27; *see Arizona v. Johnson*, 555 U.S. 323, 326 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop,... the police must harbor a reasonable suspicion that the person subjected to the frisk is armed and dangerous."). Such an intrusion is only permissible when the officer can identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. When faced with an officer's protective search of an individual for weapons, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the inference in the first place." *United States v. Pittman*, 338 F. App'x 147, 149 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20).

The calculation is different if the defendant consented to the pat down in which case the court must determine the voluntariness of the consent by evaluating the totality of the circumstances—if the consent was valid, the pat down was constitutional. *See, e.g., Tam Thanh Ngyuen v. Pennsylvania*, Civ. A. No. 15-5082, 2017 WL 5113229, at *9-10 (E.D. Pa. Nov. 6, 2017), *aff'd*, 906 F.3d 271 (3d Cir. 2018).

"In performing these on-mission tasks, '[o]fficers should be reasonably diligent,' and 'the best indication of whether an officer has been reasonably diligent is by noting what the officer actually did and how he [or she] did it.'" *Hurtt*, 31 F.4th at 160 (quoting *United States v. Yusuf,* 993 F.3d 167, 182 (3d Cir. 2021) (internal quotation omitted)).  While "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop[,] . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez* at 355.  As stated in *Garner*, "[t]o lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring."  961 F.3d at 271 (citing *Rodriguez*, 575 U.S. at 355; *Clark*, 902 F.3d at 410).  If the officer possessed reasonable suspicion of criminal activity prior to extending the traffic stop, no violation of the Fourth Amendment has occurred.  *See id*.

When reviewing the allegation that a traffic stop was improperly extended, the court is to "review objectively the officer's rationale, by looking to the facts and circumstances confronting him or her, to determine whether his or her actions during the stop were reasonable." *Clark*, 902 F.3d at 409 (citing *Delfin-Colina*, 464 F.3d at 397–98).  The reasonable suspicion standard "requires 'considerably less than proof of wrongdoing by a preponderance of the evidence,' but requires more than a 'hunch.'" *Garner*, 961, F.3d at

271 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry v. Ohio*, 392 U.S. 1, 27

(1968)).

> In applying this standard, courts invoke several common themes.  First,
> reasonable suspicion must always be evaluated under the totality of the
> circumstances. *United States v. Cortez*, 449 U.S.411, 417, 101 A.Ct. 690, 66
> L.ed.2d 161 (1981).  Accordingly, courts have consistently refused to adopt per
> se rules declaring a particular factor sufficient or insufficient to establish
> reasonable suspicion.  *See Illinois v. Wardlow*, 528 U.S. 119, 126-27. 120 S.Ct.
> 673, 145 L.Ed.2d 570 (2000) (Stevens, J., dissenting). Second, when
> assessing the totality of the circumstances, courts recognize the particular
> ability of law enforcement officers, based on training and experience, "to make
> inferences from and deductions about the cumulative information available to
> them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534
> U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting COrw, 449 U.S.
> at 418, 101 S.Ct. 690).   Third, and consistent with the totality of the
> circumstances approach, reasonable suspicion cannot be defeated by a so-
> called "divide-and-conquer" analysis, whereby each arguably suspicious factor
> is viewed in isolation and plausible, innocent explanations are offered for each.
> *District of Columbia v. Wesby*, —— U.S. ——, 138 S.Ct. 577, 589, 199 L.Ed.2d
> 453 (2018). In *Terry* itself, the Court found there was reasonable suspicion to
> justify the temporary seizures even though each factor relied on by the officer,
> viewed in isolation, might have seemed perfectly innocent.  *Arvizu*, 534 U.S. at
> 274, 122 S.Ct. 744 (citing *Terry*, 392 U.S. at 22, 88 S.Ct. 1868).

*Green*, 897 F.3d at 183.

Here, Defendant contends that the traffic stop went off mission and was

impermissibly prolonged when Nowicki conducted a pat-down search.  (Doc. 84 at 7.)  The

Government notes that the parties disagree over when Nowicki deviated from the mission of

the traffic stop but this disagreement is irrelevant because ample cause for reasonable

suspicion existed when Nowicki asked Defendant to get out of the vehicle.[8]  (Doc. 87 at 25.)

The Court will assume *arguendo*, as the Government has, that the "*Rodriguez* moment"

occurred when Nowicki asked Defendant to get out of the vehicle.  The Court finds that

Nowicki had reasonable suspicion to extend the traffic stop before he made this request.

The Government points to the following bases for Nowicki's reasonable suspicion at

the relevant time:

> Within the first minute of the traffic stop, and while NOWICKI was still
> outside the defendant's passenger door, he had the following indicators for
> reasonable suspicion of criminal activity, based upon his training and
> experience in criminal interdiction: (1) that the defendant was driving on I-80
> West, a known drug-corridor; (2) that the defendant was driving a third-party
> rental vehicle: (3) that the defendant was from Cleveland, Ohio, a known drug
> source city; (4) that the defendant did not have the rental agreement for the
> vehicle which had been rented by another person; (5) that the defendant had
> no insurance documentation for the rental vehicle; (6) that the defendant
> refused to look in the glove compartment of the vehicle to see if the rental
> agreement and insurance were located inside; (7) that the defendant had no
> jacket or luggage although he was on an interstate trip in Pennsylvania and
> Ohio during late November; (8) that the defendant did not have a valid copy of
> his driver's license, but only a scanned paper copy . . . which NOWICKI
> was unable to positively identify [as] the defendant; (9) that the defendant had
> stated that he had taken the rental agreement out of the car and left it in his
> home; (10) that the defendant appeared visibly nervous and shook
> NOWICKI's hand upon their first contact; (11) that the defendant had "white-
> lined" his vehicle when complying with the traffic stop; and last, but certainly
> not least, that (12) although the defendant was driving a clean rental car, he
> had a tree air-freshener on the rear-view mirror and NOWICKI detected a
> strong odor of a dope masking agent.

---

[8] The Government notes that its "position is that the traffic stop portion . . . was extended only upon
the first 'control questions' which NOWICKI asked the defendant, intending to gauge the defendant's
truthfulness. The first such question occurred at approximately 8:05 into MVR Dashcam footage. Gov't Ex.
1." (Doc. 87 at 25 n.11.)

(Doc. 87 at 25-26.)

Based on the totality of the circumstances, *Cortez*, 449 U.S. at 417, and Nowicki's training and experience to make inferences and deductions related to events which transpired before he asked Defendant to get out of his vehicle, *Arvizu*, 534 U.S. at 273, the Court concludes that Nowicki had the requisite reasonable suspicion to extend the traffic stop.  While there may be plausible and innocent explanations for each suspicious factor cited by Defendants, consistent with the totality of the circumstances approach, reasonable suspicion cannot be defeated by this type of "divide-and-conquer" analysis.  *Wesby*, 138 S.Ct. at 589.

As summarized in the Government's brief in opposition to the pending motion, factors upon which the Government relies are recognized indicators of criminal activity giving rise to reasonable suspicion:

> *See* [*United States v. Meran*, Crim. No. 16-22, 2017 WL 4803927, at *3 (W.D. Pa. Oct. 23, 2017)] (". . . third party vehicles are commonly used by smugglers, so that the individuals who are in the vehicle can claim they have no knowledge of its contents."); [*United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (defendant speeding, operating a vehicle that belonged to a third party, and traveling a route often used for transporting drugs); *United States v. Frierson*, 611 Fed. Appx. 82 (3d Cir. 2015) (driver and vehicle were from another state); *United States v. Prado*, 2017 WL 1653957 * 7 (M.D. Pa. 2017) (Mariani J.) (defendant driving car that did not belong to him formed part of reasonable suspicion); *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008) (defendant's "evident nervousness, the presence of air fresheners, and the fact that he was driving a car not registered to him. These factors, in combination, could form the basis for reasonable suspicion of narcotics trafficking."); *United States v. Iturbe-Gonzalez*, 100 F. Supp. 3d 1030, (D. Mont. 2015) (defendant driving vehicle registered to another person).

(*See* Doc. 43 at 24 n.23.)

Looking to the facts and circumstances confronting Nowicki to determine whether his actions were reasonable, *Hurtt*, 31 F.4th at 159, the air freshener in a non-smoking rental car was an early and legitimate basis for suspicion to be aroused.  In general, the use of air fresheners is a recognized factor contributing to reasonable suspicion.  *See, e.g., Garner*, 961 F.3d at 274; *United States v. Robinson*, 529 F. App'x 134, 139 (3d Cir. 2013); *United States v. Dennis*, 527 F. App'x 221, 222 (3d Cir. 2013).  Nowicki testified that he noted when he first saw Defendant's vehicle that it had a non-smoking sticker on the driver-side window and an air freshener hanging from the rear-view mirror.  (Hr'g Tr. Day 1 23:24-24:3, Doc. 64.)  He explained that the sticker indicated to him that it was a rental vehicle and an air freshener is not common with rental vehicles so that immediately caught his attention. (*Id.* 25:4-8.)  The fact that Defendant was driving a third-party vehicle is a significant factor (*see* Doc. 43 at 23 n.23) made more so by the fact that he said he did not have the rental documents in the vehicle and did not want to check the glove compartment for them.  *See supra* p. 8.  Defendant had only a scanned copy of a driver's license and no vehicle or insurance documentation.  *Id.*  These factors alone or in combination with other factors identified by the Government, including the fact that Defendant had no jacket in cold November weather, no luggage for an interstate trip, and his perceived nervousness, *see supra* p. 29, support a conclusion that Nowicki had reasonable suspicion to extend the traffic stop.

The fact that Nowicki conducted a pat down does not undermine the constitutionality of Nowicki's extension of the stop.  Contrary to Defendant's assertion in his post-hearing brief (*see* Doc. 84 at 7), the MVR shows him consenting to the pat down and nothing indicates that the consent was invalid.  *See supra* p. 9, p. 26 n.7.

Similarly, Defendant's assertion that inquiries unrelated to the traffic stop impermissibly prolonged the stop (Doc. 84 at 9), is without foundation.  The inquiries identified occurred after he got out of his vehicle, i.e., after the traffic stop was permissibly extended.

To the extent Defendant bases a claimed Fourth Amendment violation on his assertion that Nowicki was "aggressive" in escorting him out of his vehicle (*id.* at 4), the MVR shows otherwise.  As set out in the Background section of this Memorandum Opinion, the MVR clearly shows that Nowicki did not behave aggressively while Defendant got out of his vehicle or at any time before Defendant's attempted flight.  *See supra* pp. 8-13.

## C. Defendant's Arrest

Although the last section of Defendant's brief is captioned "EXCESSIVE FORCE Resulting in UNLAWFUL ARREST" (Doc. 84 at 13), the body of the section does not identify what force he considers to be excessive (*see id.* at 13-15).  Review of the MVR shows that force was used to arrest Defendant after his attempted flight, but Defendant's apparent resistance and failure to comply with officer's orders warranted the use of force.  *See supra* p. 13.  The MVR does not reveal that *excessive* force was used.  Further, as to the required

probable cause for the arrest, the Government correctly points out that, when Defendant

attempted to flee the scene, Nowicki's "reasonable suspicion of criminal activity turned into

probable cause that the defendant was committing a crime, namely Flight to Avoid

Apprehension, Trial, or Punishment (18 Pa.C.S.A. § 5126), Reckless Endangering Another

Person (18 Pa.C.S.A. § 2705), and Resisting Arrest (18 Pa.C.S.A. § 5104)." (Doc. 87 at 31-

32.) Accordingly, the Court finds no basis to conclude that Defendant's arrest was unlawful.

## IV. CONCLUSION

For the foregoing reasons, Defendant Rashawn Hawari-Rasulullah's Motion to

Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States

Constitution (Motion for Hearing) (Doc. 40) will be denied. A separate Order will be entered.

Robert D. Mariani
United States District Judge

33