**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **3:21-CR-66** |
| | : | **(JUDGE MARIANI)** |
| **RASHAWN HAWARI-RASULULLAH,** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Here the Court considers Defendant Rashawn Hawari-Rasulullah's pro se Motion for

a Judgment of Acquittal (Doc. 166) filed on December 31, 2022.  Defendant timely filed this

motion following his seven-day trial which commenced on December 7, 2022, and ended on

December 19, 2022.  Defendant represented himself at trial, and Elliot Smith, Esq., was

standby counsel.  The jury found Defendant guilty of all counts contained in the March 16,

2021, Indictment charging him with Possession with Intent to Distribute a Mixture or

Substance Containing a Quantity of Cocaine, in violation of Title 21, United States Code,

Section 841(a)(1), Possessing a Firearm, namely a .380 Cobra FS380, S/N FS112393, in

furtherance of a drug trafficking crime for which he may be prosecuted in a court of the

United States, in violation of Title 18, United States Code, Section 924(c), and Felon in

Possession of a Firearm, in violation of Title 18, Section 922(g)(1) (Doc. 1 at 1-3.)  The

Indictment also contained a Forfeiture Allegation.  (Doc. 1 at 3.)

The Government filed its opposition brief (Doc. 182) on February 7, 2023, and Defendant filed a one-page reply (Doc. 183) on February 17, 2023. Therefore, this matter is fully briefed and ripe for disposition. For the reasons discussed below, the Court will deny the Motion.

## II. BACKGROUND

### A. Factual Background

The event giving rise to this action was a traffic stop on Interstate 80 at approximately 9:00 a.m. on November 22, 2020, when Defendant's vehicle was travelling westbound in Monroe County, Pennsylvania. The stop and following events at the scene were recorded on the recording devices ("MVRs") located on the vehicles of three Pennsylvania State Police ("PSP") troopers: Trooper Kody Nowicki ("Nowicki") who stopped Defendant's vehicle at approximately 9:00 a.m. on November 22, 2020; PSP Trooper Jonathan Lazarchick, the second officer on the scene who arrived about ten minutes after Nowicki initiated the stop; and PSP Trooper Thomas Rehberg, the third officer on the scene who arrived shortly after Lazarchick. (Gov't Ex. 1.1.)

On the first three days of trial, the jury viewed the three MVRs (Gov't Exs. 1.1, 1.2, 1.3) which had been admitted into evidence. (Trial Transcript ("T. Tr.") Day 1 146:18-147:19 (Doc. 174); T. Tr. Day 2 3:7-8, 159:25-160:5 (Doc. 175); T. Tr. Day 3 59:8-60:10 (Doc. 176).) To provide context for Defendant's pending Motion, the Court reiterates a previous summary of the Nowicki and Lazarchick MVRs:

Before stopping Defendant's vehicle, Nowicki's MVR shows the vehicle travelling in the left lane with no vehicles in the right lane. (Nowicki MVR:45-1:00.)[1] After the vehicle came to a stop on the shoulder of the highway, Nowicki exited his car and approached the passenger side of Defendant's vehicle, shining a flashlight in the tailgate window as he went by. (MVR1 2:45.) Nowicki's interaction with Defendant begins with Nowicki introducing himself and informing Defendant that he was being stopped because he was driving in the left lane and slightly exceeding the speed limit. (MVR1 2:55.) After being asked for his license, registration, and proof of insurance, Defendant informed Nowicki that it was a rental car but he had left the rental agreement at his house in Cleveland and he had no registration or insurance information. (MVR1 3:11.) When asked about the specific rental company, Defendant did not immediately answer but, after a brief delay, identified Dollar as the rental company. (MVR1 3:55-4:10.) Questions about who had rented the car followed. (MVR1 4:11.) Defendant said his "bro" had rented the car and, when Nowicki sought confirmation that it was his "brother," Defendant confirmed that it was. (MVR1 4:14.)

Nowicki then commented that it was cold, asked Defendant if he had a jacket, and Defendant responded that he did not. (MVR1 4:20.) Shortly thereafter, Nowicki asked Defendant to come back to his vehicle and told Defendant that he was not making him do it. (MVR1 4:33.) Defendant exited his vehicle and Nowicki asked "no weapons on you or anything like that?" to which Defendant responded "no." (MVR1 4:46.) When Nowicki asked "Do you mind if I just pat you down real quick?" Defendant did not object. (MVR1 4:48.) After a brief pat down, they proceeded toward Nowicki's vehicle.

What follows is audio where Defendant is presumably standing by the passenger door with Nowicki in the car making small talk and asking questions about Defendant's travel. (MVR1 5:22.) Defendant said that he stayed with family around JFK/Queens. (MVR1 7:15.) Nowicki also asked Defendant if he has ever been in legal trouble, and Defendant responded that he is in a situation trying to get custody of his young daughter. (MVR1 8:00.) Nowicki again asked who rented the vehicle and Defendant responded that his close

---

[1] Trooper Nowicki's MVR is hereafter identified as "MVR1."

friend did.   (MVR1 8:40.)   When asked why he did not rent the vehicle, Defendant replied that he had spent the limit on his credit card.  (MVR1 8:50.)

When Defendant asked if he could sit down, Nowicki confirmed that Defendant meant up at his car and said "OK," adding that he would go to Defendant's car with him. (MVR1 9:47.) Defendant is then seen walking to the driver's door of his car.  Nowicki stopped at the tailgate and asked Defendant to join him there because Nowicki wanted to ask a few questions.  (MVR1 10:00.)   Defendant joined Nowicki at the tailgate, and Nowicki asked him whether there was any weapon in the car, followed by questions about whether specific controlled substances (marijuana, heroin, methamphetamine, cocaine) were in the car.  (MVR1 10:05.)  In each instance, Defendant answered in the negative.  (*Id*.)  Thereafter, Nowicki asked Defendant if he had permission to search the car and Defendant answered no.  (MVR 1 10:20.)

Nowicki then again questioned Defendant about whether he had a jacket. (MVR1 10:22.) Defendant responded that he would get his jacket which he indicated was in the car.  (*Id*.)   As Defendant continued to walk toward the driver-side door, Nowicki said he would get the jacket, adding that he did not want Defendant "jumping in there."  (MVR1 10:26.)  Nowicki then said "wait, wait, wait" as Defendant proceeded to open the door.  (*Id*.)  Nowicki repeated that he would grab the jacket, but Defendant got into the car indicating the jacket was "right there." (MVR1 10:33.) While leaning into the vehicle, Nowicki stated "yeah, you're going to step out with me" followed by repeatedly yelling, with increasing intensity, "don't do it!"  (MVR1 10:45.)  At this point on the MVR, another officer can be seen walking toward the passenger side of Defendant's vehicle.  (MVR1 10:47.)

With an obvious scuffle occurring in the front seat, Defendant's vehicle moved forward, veered off the road and down an embankment, and came to rest in a wooded area at the bottom of the hill.  (MVR1 10:48-11:00.)  The second officer, PSP Trooper Jonathan Lazarchick, ran down the embankment. (*Id*.)  After the car stopped, it appears that Nowicki pulled Defendant out of the car and they both fell to the ground.  (MVR1 11:05.)

At about this time, another PSP vehicle arrived.   (MVR1 11:03.) Lazarchick and the third officer, PSP Trooper Thomas Rehberg, ran to assist Nowicki and an officer can be heard yelling several times for Defendant to "stop resisting."  (MVR1 11:18.)   An officer can also be heard telling Defendant to

get his hands behind his back and "get your hand out" before Defendant was placed in handcuffs. (MVR1 11:30.)

Nowicki then staggered up the bank and collapsed on the ground while another officer called for EMS. (MVR1 12:00.)   After several more officers arrived, Defendant was escorted up the bank and left the scene. (MVR1 17:50.)   Nowicki remained lying on the bank until the ambulance arrived. (MVR1 21.00.) At about this time, officers on scene photographed the site and appeared to comb the area of tall brush where Defendant's vehicle came to rest. (MVR2 25:30.[2])   Several minutes later, an officer searching near the vehicle appears to summon others. (MVR2 32:00.) When the officers disperse, one of them is carrying a large manilla envelope, the contents of which are unknown to the viewer. (MVR2 38:00.)

(Doc. 88 at 3-7.)

At trial, Lazarchick testified that he noticed a firearm on the ground where Defendant had been lying face down approximately fifteen minutes after Defendant had been removed from the scene where the struggle had occurred and placed in a patrol vehicle,. (T. Tr. Day 3 55:10-56:6 (Doc. 176).)  PSP Corporal Jesse Bachman, a Forensic Services Unit trooper, photographed the scene and identified a photograph of a firearm laying on the ground stating that "it's like a desert tan color, it's very hard to see." (T. Tr. Day 4 55: 1-6 (Doc. 178) (identifying Gov't Ex. 2.66).)  Bachman proceeded to identify and explain other photographs of the firearm taken in the location where it was found. (*Id.* 55:7-56:1 (identifying Gov't Exs. 2.69, 2.70, and 2.71).)  He further testified that the gun contained seven live rounds. (*Id.* 58:1-7 (identifying Gov't Ex. 2.88).)

---

[2] MVR2 is the Mobile Vehicle Recording from Trooper Lazarchick's vehicle.

When the vehicle was later searched at the State Police barracks pursuant to a search warrant, Bachman testified that items, some of which had been viewed at the scene, were photographed.  (T. Tr. Day 4 62:21-63:7 (Doc. 178).)   Bachman's photographs included a pair of camo jeans and the contents of the cargo pockets of the jeans: $2700 in cash and a plastic bag within which was a second vacuum-sealed clear plastic bag containing a quarter kilogram of white substance.  (*Id.* 68:19-24, 69:19-23, 74:8-15.)  These photographs were admitted into evidence.  (*Id.*)

The white substance was analyzed at the PSP Wyoming Regional Laboratory by Kenneth Mayberry who was admitted as an expert in drug analysis without objection.  (T. Tr. Day 4 160:13-19 (Doc. 178).)  Mayberry determined the substance contained cocaine weighed 247.59 grams.  (*Id.* 165:4-5. 166:23-25.)

## B. Procedural Background

Charges stemming from the events of November 22, 2020, were originally investigated by the PSP and filed in the Monroe County Court of Common Pleas.  (T. Tr. Day 3 1-6:1-7 (Doc. 176).)  On March 16, 2021, a federal grand jury handed down the three-count Indictment charging drug and weapons violations of federal law (Doc. 1).  See supra p.1.

On August 12, 2021, the Court granted Defendant's request to proceed pro se. (Doc. 31.)  Elliot Smith from the Office of the Public Defender was appointed as standby counsel on August 13, 2021.  (*Id.*)

On September 20. 2021, Defendant filed the "Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment to the United States Constitution (Motion for Hearing)." (Doc. 40.)  The Court first determined that Defendant's allegations regarding statements made in, or omitted from, the Search Warrant's Affidavit of Probable Cause did not entitle him to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  (Docs. 53, 54.)  The Court therefore limited the suppression hearing to the remaining issue of whether Defendant's seizure violated the Fourth Amendment.  (Doc. 54 ¶ 2.)  A suppression hearing was held over three days in February and March 2022.  (*See* Docs. 59, 66, 70.) Following the submission of post-hearing briefs (Docs. 84, 87), the Court determined that no Fourth Amendment violation had occurred and, therefore, denied Defendant's Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment (Doc. 40).  (*See* Docs. 88, 89.)

By Order of August 15, 2022, the Court scheduled trial to commence on November 7, 2022.  (Doc. 90.)  On October 18, 2022, Defendant filed a motion pursuant to Federal Rule of Criminal Procedure 17 seeking subpoenas for fifty-four witnesses to appear at trial. (Doc. 97.)  Because Defendant did not show a particularized need for each witness's testimony as required by the rule, the Court denied the motion without prejudice.  (Doc. 99 at 3-4.)  Plaintiff did not file another Rule 17 motion but filed a two-page brief in support of his October 18th motion, stating that his previous filing contained adequate information. (Doc. 102 at 1-2.)  By Order of October 27, 2022, the Court confirmed its determination that

Defendant had not satisfied the requirements of Rule 17, assured Defendant that proper

authentication procedures would be followed at trial, and allowed him until November 7,

2022, to file another Rule 17 motion.  (Doc. 103.)  Plaintiff did not thereafter file a Rule 17

motion.

The Court decided numerous motions in limine on October 31, 2022. (*See* Docs.

116-119.)  The Court denied the Government's Federal Rule of Evidence 404(b) and 609

motions without prejudice.  (Doc. 117 ¶¶ 1, 2.)  The Court granted the Government's motion

to introduce evidence that Defendant refused to submit saliva and blood samples which

were sought pursuant to warrants.  (*Id.* ¶ 3.)  The Court denied Defendant's motions to

exclude hearsay statements of officers and to exclude firearm evidence without prejudice.

(Doc. 119.)

Defendant filed his "Motion to Dismiss Indictment with Prejudice in Violation of the

Sixth Amendment Speedy Trial Right, and the Speedy Trial Act" (Doc. 123) on November 4,

2022.  On the same day, the Court rescheduled the trial to December 7, 2022.  (Doc. 125.)

After considering hearing testimony and evidence as well as pre and post-hearing briefs, the

Court determined there was no violation of the Sixth Amendment or Speedy Trial Act and,

therefore, denied Defendant's motion.  (*See* Docs. 131, 132, 134.)

Trial commenced on December 7, 2022, and concluded on December 19, 2022.

The trial was trifurcated: phase one considered Counts 1 and 2 of the Indictment regarding

possession with intent to distribute a controlled substance and possession of a firearm in

furtherance of a drug trafficking crime; phase two considered Count 3, charging Felon in

Possession of a Firearm; and phase three considered the Forfeiture Allegation.  The jury

found Defendant guilty on all counts and concluded that the firearm and $2,727 were

subject to forfeiture.  (Docs. 153, 156, 159.)

## III. STANDARD OF REVIEW

A defendant may move for a judgment of acquittal pursuant to Federal Rule of

Criminal Procedure 29.  Where "the jury has returned a guilty verdict, the court may set

aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2).

> In ruling on a motion for judgment of acquittal made pursuant to Fed. R. Crim.
> P. 29, a district court must "'review the record in the light most favorable to
> the prosecution to determine whether any rational trier of fact could have
> found proof of guilty [sic] beyond a reasonable doubt based on the available
> evidence.'" *United States v. Smith,* 294 F.3d 473, 476 (3d Cir. 2002) (quoting
> *United States v. Wolfe,* 245 F.3d 257, 262 (3d Cir. 2001)). A finding of
> insufficiency should be "'confined to cases where the prosecution's failure is
> clear.'" *Smith,* 294 F.3d at 477 (quoting *United States v. Leon,* 739 F.2d 885,
> 891 (3d Cir. 1984)). Courts must be ever vigilant in the context of Fed. R.
> Crim. P. 29 not to usurp the role of the jury by weighing credibility and
> assigning weight to the evidence, or by substituting its judgment for that of the
> jury. *See United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir.) (en banc) (trial
> court usurped jury function by deciding contested issues of fact), *cert. denied,*
> 457 U.S. 1106, 102 S. Ct. 2906, 73 L.Ed.2d 1315 (1982); *see also* 2A Charles
> A. Wright, FED. PRAC. & PRO. (Criminal 3d) § 467 at 311 (2000) ("A number
> of familiar rules circumscribe the court in determining whether the evidence is
> sufficient ... It is not for the court to assess the credibility of witnesses, weigh
> the evidence or draw inferences of fact from the evidence. These are
> functions of the jury.").

*United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005).  "A defendant 'challenging the

sufficiency of the evidence' pursuant to Rule 29 'bears a heavy burden.'"  *United States v.*

*John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014) (quoting *United States v. Casper,* 956 F.2d

416, 421 (3d Cir.1992)).

The Third Circuit has long advised that, in considering a post-verdict judgment of

acquittal, the court "must uphold the jury's verdict unless no reasonable juror could accept the

evidence as sufficient to support the defendant's guilt beyond a reasonable doubt." *United*

*States v. Fattah*, 914 F.3d 112, 183 (3d Cir. 2019) (citing *United States v. Coleman*, 811 F.2d

804, 807 (3d Cir. 1987)).  In *United States v. Tyler*, the Third Circuit again recently reiterated

the well-recognized standard:

> This review is "highly deferential" to the factual findings of the jury, and we
> "must be ever vigilant ... not to usurp the role of the jury by weighing credibility
> and assigning weight to the evidence, or by substituting [our] judgment for
> that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d
> Cir. 2013) (en banc) (alteration and omission in original) (quoting *United*
> *States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

> Thus, even if the evidence adduced is consistent with multiple
> possibilities, our role as a reviewing court is to uphold the jury verdict
> ... as long as it passes the bare rationality test. Reversing the jury's
> conclusion simply because another inference is possible – or even
> equally plausible – is inconsistent with the proper inquiry for review of
> sufficiency of the evidence challenges, which is that [t]he evidence
> does not need to be inconsistent with every conclusion save that of
> guilt if it does establish a case from which the jury can find the
> defendant guilty beyond a reasonable doubt. It is up to the jury – not
> the district court judge or our Court – to examine the evidence and
> draw inferences. Unless the jury's conclusion is irrational, it must be
> upheld.

> *Id.* at 433 (alteration in original) (internal quotation marks and citation omitted).

956 F.3d 116, 122-123 (3d Cir. 2020). The "bare rationality test" looks at the verdict from the

perspective of a reasonable juror, and "the verdict must be upheld as long as it does not 'fall

below the threshold of bare rationality,'" *Caraballo-Rodriguez*, 726 F.3d at 431 (quoting

*Coleman v. Johnson*, 566 U.S. 650, 657 (2012)), i.e., "[u]nless the jury's conclusion is

irrational, it must be upheld," *id.* at 432. The court "review[s] the evidence as a whole, not in

isolation, and ask[s] whether it is strong enough for a rational trier of fact to find guilt beyond

a reasonable doubt." *Id.* at 430.

## IV. ANALYSIS

Defendant raises numerous issues in his Motion for a Judgment of Acquittal (Doc.

166). Beyond conclusory statements and citation to perceived deficiencies in certain

witnesses' testimony, Defendant does not attempt to mount an argument that the evidence

as a whole was insufficient. He begins with two general statements as to why his Motion

should be granted and proceeds to specific problems as to each count charged. (*See id.*)

In response to his Motion, the Government's Brief in Opposition asserts that the jury had

sufficient evidence to find Defendant guilty on all counts charged and provides a summary

of evidence relevant to each count. (Doc. 182 at 27-38.) Defendant filed a one-page reply

which states only that he reiterates what was in his initial Motion and the Government has

not proven its case beyond a reasonable doubt, "only persuading the jury through prejudice,

propaganda, and misinformation." (Doc. 183.)

The Court has reviewed the evidence as a whole and concurs with the Government's summary of evidence and its sufficiency to satisfy the elements of each count charged. Notwithstanding the conclusion that the evidence as a whole "is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt," *Caraballo-Rodriguez*, 726 F.3d at 430, the Court will review Defendant's arguments and specific assertions cited in support of his Motion.

Defendant first states that there is no evidence "upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt [because] the Government's case is speculation and suspicion at best not . . . not supported by evidence required for jury consideration." (Doc. 166 at 2 (internal quotation marks omitted).) Defendant next contends that

> the Court erred in admitting into evidence all of Government's Exhibits because each of said exhibits was obtained as a result of an arrest without probable cause or as a result of an unconstitutional search or seizure in violation of the defendant's rights under the Fourth Amendment of the Constitution of the United States. Absent the admission into evidence of the said exhibits, the state of the evidence was such that the jury could not base a finding thereon that the Defendant was guilty beyond a reasonable doubt.

(Doc. 166 at 2.)

Specific allegations as to the first argument will be discussed below. The second argument and any related specific allegations can be disposed of summarily in that, following a three-day suppression hearing and extensive briefing, the Court determined that

no Fourth Amendment violation occurred in this case and, therefore, suppression of evidence was not warranted.  (*See* Docs. 88, 89.)

**A.  Count 1**

Defendant states that a reasonable jury could not have found him guilty of Count 1, Possession with Intent to Distribute Cocaine, and cites issues related to the identification of the substance and inconsistencies in officers' testimony.  (Doc. 166 at 3-6.)  Neither argument shows insufficiency.

As to substance identification, Defendant's main issue is how the substance was packaged and the inadequacy of the testing sample.  Defendant stipulated to the admission of the individual who analyzed the white substance at the PSP Wyoming Regional Laboratory, Kenneth Mayberry, as an expert in drug analysis.  (T. Tr. Day 4 160:13-19 (Doc. 178).)  Mayberry determined the substance contained cocaine and weighed 247.59 grams. (*Id.* 165:4-5. 166:23-25.)  Mayberry testified extensively about his methodology in general and specifically as to this case, including the packaging of the substance and sampling protocol, as well as the basis for his conclusions.  (*Id.* 160:22-168:13.)  Defendant cross-examined Mayberry about the sample he tested, characterizing it as a "small portion" of the total, and Mayberry explained that, when the substance to be tested is packaged like the substance in this case, the policy is to take one sample.  (*Id.* 6:22-7:25.)  Thus, the jury heard testimony from a witness who was acknowledged to be an expert in the field of drug analysis and heard Defendant attempt to cast doubt on the procedure used and conclusions

drawn.  Mayberry provided ample testimony for a jury to believe that his conclusions were

valid.  The fact that Defendant's attempt to cast sufficient doubt on those conclusions failed

does not point to a basis to find the evidence insufficient as to Count 1.

 Defendant's argument regarding insufficiencies in officers' testimony is similarly

unavailing.  Defendant first points to what he sees as inconsistencies in the testimony of

Corporal Ian Macmillan, the criminal investigator who arrived at the scene of the incident at

about 10:00 a.m. on November 22, 2020.  (T. Tr. Day 3 102:12-25 (Doc. 176).)   Defendant

finds inconsistency in the Receipt Inventory of the Search Warrant which reports 287 grams

of cocaine, Suppression Hearing testimony regarding no cocaine charge being filed on

November 22, 2020, MacMillan's confirmation that the substance found on that date was

consistent with cocaine, and trial testimony where MacMillan said the substance found was

packaged like cocaine.  (*See* Doc. 166 at 3-4.)

 At trial, Defendant cross-examined MacMillan about the weight of the cocaine, the

identification of cocaine in the Search Warrant receipt, and how MacMillan knew it was

cocaine.  (T. Tr. Day 3 138:14-20, 142:16-143:20 (Doc. 176).)  MacMillan explained that he

had gotten information from the officers who conducted the search of the vehicle and the

appearance and packaging were consistent with cocaine so it was suspected cocaine on

the day Defendant was arrested and the suspicion was later confirmed.  (*Id.* 138:21-

139:13.) Defendant cross-examined MacMillan about when cocaine charges were first filed,

proposing that the fact that cocaine charges were not added until after his arrest meant that

14

no cocaine was found on November 22nd. (*Id.* 130:20-131:8.)  MacMillan explained that the suspected cocaine was found on November 22nd but the drug charge was added before the preliminary hearing through the District Attorney's Office perhaps because of the timing of when it was found.  (*Id.* 130:22-132:7.)  MacMillan also explained that the weight of the cocaine when field tested on an uncertified scale was 287 grams and when weighed on the certified lab scale it was 257.59 grams, a variance which can be explained by equipment and packaging.  (*Id.* 142:16-143:20.)

The foregoing citations to the Trial Transcript show that Defendant directed the jury's attention to what he perceived to be weaknesses in the Search Warrant information and MacMillan's testimony. The Transcript also shows that MacMillan responded to each inquiry with sufficient information to allow the jury to rationally find that MacMillan was credible and cocaine was found on November 22, 2020.  Therefore, this testimony does not undermine the sufficiency of the evidence related to Count 1 of the Indictment.

Defendant next identifies what he considers to be problems with Corporal Jesse Bachman's testimony.  (Doc. 166 at 4.)  He points to the following: Bachman's Supplemental Report was never received into evidence; Bachman only took photos during the vehicle search; he testified that Corporal Gerald Lydon took a plastic bag containing suspected cocaine out of the vehicle but he did not see him do it; and the inventory documents have Bachman's signature but he is not the evidence custodian.  (Doc. 166 at 4.)

At trial, a discussion was held outside of the jury's presence about Bachman's Supplemental Report and why it was not of record.  (T. Tr. Day 4 3:5-4:18 (Doc. 178).)  The Court told Defendant that he could cross-examine Bachman "on what, exactly, he did, what he didn't do, where his report is and anything else you want to cross-examine him on, with respect to that."  (*Id.* 193:19-22.)  During his cross-examination, Defendant did not question Bachman about the report or the signature on the inventory documents and he provides no basis now to find that either issue impacts whether the jury had sufficient evidence related to Count 1.

Defendant questioned Bachman at length about the what, where, when and why of his photographs.  (*Id.* 85:14-114:23.)  In each instance, Bachman provided explanations which would allow a rational jury to find him credible.  (*Id.*)  Therefore, it was the jury's province to weigh credibility and assign weight to the evidence introduced through Bachman's testimony.  Defendant provides no basis to find that Bachman's testimony and related evidence, combined with other evidence of record, was insufficient to support a guilty verdict on Count 1.

Defendant asserts that retired PSP Trooper Thomas O'Brien, the evidence custodian at the relevant time, did not recall taking evidence related to this case into custody and testified that official property sheets had not been produced.  (Doc. 166 at 4.)  This is not an accurate characterization of O'Brien's testimony in that O'Brien stated that he did not recall that he signed paperwork to receive property related to this case, something which other

officers could and often did do, but he definitely entered the appropriate information into the

evidence computer.   (T. Tr. Day 4 141:1-143:14 (Doc. 178).)  O'Brien provided an

extensive explanation of custody practices and procedures as well as the significance of

certain documents related to this case.  (*Id.* 118:17-143:12.)  O'Brien also continually

attempted to correct what he believed to be Defendant's misapprehension of the practices

and procedure he was explaining.  (*Id.*)  Thus, Defendant's assertions related to O'Brien's

testimony do not provide any basis to find insufficient evidence to support the jury's verdict

in Count 1.

Regarding the testimony of Francis Carito, a Pennsylvania State Trooper and Drug

Enforcement Administration Task Force Officer, Defendant points to the testimony that there

was no informant or wiretap in this case confirming drug related transactions and finds fault

with Carito's testimony about the meaning of certain aspects of phone conversations.  (Doc.

166 at 6.)  Carito was admitted as an expert in drug trafficking over Defendant's objection.

(T. Tr. Day 5 148:19-23 (Doc. 179).)

The lack of a wiretap or confidential informant is not relevant to the sufficiency of the

evidence given the circumstances of this case.  Likewise, Defendant's stated problem with

Carito's testimony presents no sufficiency issue: Carito was properly admitted as an expert

and the jury was free to assess the weight to be given his testimony about aspects of

Defendant's phone conversations which Carito found to be coded language relating to drug

quantities, drug prices, negotiations for a drug price, and a drug customers' assessment of

the product.  (*Id.* 154:1-158:13.)  For the foregoing reasons, Defendant has pointed to

nothing which undermines the jury's guilty verdict on Count 1.

## B. <u>Count 2</u>

Defendant states that a reasonable jury could not have found him guilty of Count 2,

citing inconsistencies in officers' testimony on the issue of whether he was in possession of

a firearm.  (Doc. 166 at 6.)  As with his assertions related to Count 1, Defendant does not

make a cohesive argument and merely cites to various exhibits and testimony.  (*See id.* at

6-7.)  Bachman acknowledged uncertainty about precisely when the firearm was found but

testified at length about where the firearm was found, how the location was consistent with

where Defendant had been held face-down on the ground with his hands underneath him,

how the gun was somewhat camouflaged in that location, how he marked and

photographed the gun, and how he removed it from the scene.  (T. Tr. Day 4 51:8-84:14,

94:11-109:12 (Doc. 178).)  To the extent there was uncertainty about the timeline of finding

the gun, Bachman's testimony, if found credible by the jury, provided ample evidence that

Defendant possessed the firearm for the purposes of Counts 2 and 3.

In connection with Count 3, Defendant takes issue with the lack of fingerprint and

DNA evidence (which he now says would have been available in the Government's data

system), asserting that, in Count 3, equal weight should have been given to "actual

possession" of the firearm.  (Doc. 166 at 8.)  Because the jury found that Defendant

possessed the firearm in connection with their finding of guilt on Count 2 in phase one of the

trial (see Doc. 153 at 2) and the charge of felon in possession was not introduced until

phase two, the Court will address Defendant's argument in the context of Count 2.

In his closing argument, Defendant told the jury "[m]y fingerprint was not on the gun,

because I guarantee you they checked those first." (T. Tr. Day 6 58:5-6 (Doc. 180).)

Although Defendant now maintains that the Government had a sample of his DNA (Doc.

166 at 8), no evidence suggests that to be true,[3] and the jury heard evidence that he twice

refused to give DNA samples that were sought pursuant to warrants. (T. Tr. Day 5 121:6-

126:6 (Doc. 179).) The DNA samples were sought because Travis Miller, the forensic DNA

scientist for the Pennsylvania State Police who did the DNA analysis of the firearm,

indicated that a sample of Defendant's DNA would be needed to compare with the four

prints found on the firearm to see if one was a match with Defendant. (T. Tr. Day 5 22:13-

23:17, 121:6-21 (Doc. 179).)

Having heard Defendant's fingerprint argument and evidence that it could not be

determined if Defendant's DNA was on the gun because the DNA analyst did not have a

sample of Defendant's DNA due to Defendant's refusal to comply with DNA warrants, the

jury was fully informed about the lack of fingerprints and DNA on the gun before the jury

determined that Defendant had possessed the gun. Because, as discussed above, the jury

---

[3] On cross-examination of the case agent and lead investigator in this case, ATF Special Agent
Simon Abboud, Defendant asked the following question: "It was stipulated that, supposedly, there's a
criminal history, so whenever you brung into the system, isn't your DNA taken?" (T. Tr. Day 5 130:15-17
(Doc. 179).) Abboud answered: "Not all the time the time, no." (Id. 130:22.) Defendant had no further
questions. (Id. 130:23.)

had sufficient evidence on the issue of possession from Bachman and other officers to find

that Defendant had possessed the gun, the jury acted in accord with its function of

determining the credibility of witnesses, weighing the evidence, and drawing inferences of

fact from the evidence in finding Defendant guilty of Count 2.  Therefore, Defendant points

to no insufficiency of evidence in Count 2.

## C. Count 3

Defendant also argues that the evidence was insufficient to convict him of the charge

of felon in possession, Count 3 of the Indictment.  (Doc. 166 at 8.)  Defendant specifically

states the Government did not establish that he "was definitively a felon."  (Id.)

ATF Special Agent Nick Honaker, the main case agent in the case which led to

Defendant's 2010 conviction on a felon in possession charge in the Northern District of

Ohio, testified during phase two of the trial.  (T. Tr. Day 6 10:14-24 (Doc. 170).)  (Phase two

began shortly after the jury rendered its guilty verdict on both counts in phase one.)

Honaker identified Defendant as the man he knew as Rashawn Harper whom he

investigated and helped to prosecute in 2009 and 2010 in the Ohio case.  (Id. 10:14-21,

18:9-13.)  In addition to the in-court identification, Honaker testified that the identifiers in the

Ohio case and the current case, including date of birth, social security number, and driver's

license, matched up except for the name.  (Id. 13:4-16.)

The jury's determination in phase one of the trial that Defendant possessed the

firearm in Count 2 (see Doc. 153 at 2) together with evidence presented during phase two

20

that Defendant was the same person as the man convicted of the 2010 felon in possession

charge in Ohio were sufficient to find him guilty of Count 3, the felon in possession charge.

Therefore, Defendant's insufficiency argument as to Count 3 is without merit.

## D. Other Trial Matters

In Part 3 of his Motion, Defendant alleges prosecutorial misconduct and takes issue

with the Court's jury instructions and verdict form. (Doc. 166 at 9-12.) These matters do not

relate to the sufficiency of the evidence presented to the jury. Therefore, they are not

matters cognizable under a Rule 29 Motion for a Judgment of Acquittal. Because

Defendant is proceeding pro se, the Court will briefly assess whether Part 3 of his Motion

identifies any basis for relief.

Pursuant to Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion,

the court may vacate any judgment and grant a new trial if the interest of justice so requires

. . . ." Fed. R. Crim. P. 33(a).

> "Unlike an insufficiency of the evidence claim, when a district court evaluates a
> Rule 33 motion it does not view the evidence favorably to the Government, but
> instead exercises its own judgment in assessing the Government's case."
> *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir. 2002). However, even if
> a district court believes that the jury verdict is contrary to the weight of the
> evidence, it can order a new trial "only if it believes that there is a serious danger
> that a miscarriage of justice has occurred—that is, that an innocent person has
> been convicted." *Id.* (citation and quotation marks omitted). . . . Such motions
> are not favored and should be "granted sparingly and only in exceptional
> cases." *Gov't of Virgin Islands v. Derricks,* 810 F.2d 50, 55 (3d Cir. 1987)
> (citations omitted).

21

*United States v. Silveus*, 542 F.3d 993, 1004-1005 (3d Cir. 2008). "The discretion that federal trial courts exercise in addressing allegations of juror and prosecutorial misconduct extends to the determination of whether prejudice has been demonstrated." *United States v. Smith*, 139 F.App'x 475, 477 (3d Cir. 2005) (citing *United States v. Resko,* 3 F.3d 684, 690 (3d Cir. 1993)). Where a defendant alleges that the cumulative effect of trial errors resulted in an unfair trial, a new trial is required "only when 'the errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

Defendant identifies four problems with the Court's jury instructions. First, he states that the jury charge regarding evidence uses his name"3x's more than Government as to what not to take as evidence." (Doc. 166 at 8.) The Court finds no error in its instruction which explained how to consider Defendant's statements, questions, arguments, and objections while proceeding pro se and used Defendant's name again in explaining that the same considerations applied to the statements, questions, arguments, and objections of his standby counsel. (*See* T. Tr. Day 6 64:14-67:14 (Doc. 180).)

In connection with the Court's charge concerning "Not All Evidence, Not All Witnesses Needed," Defendant posits that the Court should have noted that all of Defendant's witnesses were denied. (Doc. 166 at 8.) The Court finds no error on the basis alleged: the charge was based on Model Third Circuit Criminal Jury Instruction 3.05. (*See*

22

T. Tr. Day 6 71:7-14 (Doc. 180).)  Further, as set out above, the Court's denial of

Defendant's motion pursuant to Federal Rule of Criminal Procedure 17 requesting the Court

to subpoena fifty-four witnesses was based on the fact that Defendant did not comply with

the requirements of Rule 17.  *See supra* p. 7.  He was given two opportunities to file a

properly supported Rule 17 motion (*see* Docs. 99, 103), but did not do so.  There was no

reason to inform the jury why Defendant did not present witnesses.  Moreover, any

comment by the Court as to Defendant's failure to call witnesses might have improperly

influenced the jury against Defendant by suggesting he had no witnesses to offer.

Defendant next asserts that the Court should not have given a limiting instruction

because it infers that he has a criminal history which is something the Government has to

prove.  (Doc. 166 at 8.)  The Court gave the following limiting instruction when charging the

jury on the sixth day of trial:

> As I explained to you after Trooper Nowicki testified about Mr. Hawari-Rasulullah's criminal history, you should consider the testimony of Trooper Nowicki regarding Mr. Hawari-Rasulullah's criminal history solely for the purpose of explaining Trooper Nowicki's further actions during the traffic stop on November 22, 2020.
>
> I further instructed you that Trooper Nowicki's testimony regarding the Defendant's criminal history is not to be considered by you as evidence of Mr. Hawari-Rasulullah's guilt in this case.

(T. Tr. Day 6 77:2-68:2 (Doc. 179).)

The Court gave basically the same limiting instruction immediately after Trooper

Nowicki testified on the fifth day of trial.  (T. Tr. Day 5 67:20-68:2 (Doc. 179).)  The Court did

23

so because the Court determined on the third day of trial that Defendant had opened the door to the introduction of his criminal history (T. Tr. Day 3 151:9-153:15 (Doc. 176)) and Trooper Nowicki testified about that history on the fifth day of trial for the limited purpose of explaining his further actions during the November 20, 2020, stop (T. Tr. Day 5 56:13-62:19 (Doc. 179)).  A review of the Court's limiting instruction and the circumstances which gave rise to the Court's determination that Defendant had opened the door to allowing Nowicki to testify about Defendant's criminal history indicates that Defendant's assertion regarding the limiting instruction is without merit.

Defendant's final issue with the jury instructions appears to be that the charge on "Consciousness of Guilt" was improper for numerous reasons.  (Doc. 166 at 8.)  The Court finds no error related to this charge in that it is based on Third Circuit Model Criminal Jury Instruction 4.30 and was warranted in this case.  The Court's charge accurately identifies evidence of Defendant's attempted flight and refusal to comply with warrants for his DNA as conduct which could be considered, "along with all the other evidence" in deciding whether Defendant committed the crimes charged and instructs that such behaviors could be indicative of his belief that he was guilty or his innocence.  (T. Tr. Day 6 78:7-79:6 (Doc. 180).)  Thus, Defendant's implication that it was error to give this charge is without merit.

Defendant next takes issue with the Verdict Form.  (Doc. 166 at 9.)  The Court finds no error related to the Verdict Form for any phase of the trial.  (*See* Docs 153, 156, 159.)

Finally, Defendant complains of prosecutorial misconduct related to Grand Jury transcripts, Government Exhibit 16.6, and closing statements. (Doc. 166 at 9.) The conclusory assertions do not demonstrate prosecutorial misconduct.

Because the Court has found no trial error or misconduct, Rule 33 provides no basis for relief. Therefore, Defendant's Motion is properly denied.

## V. CONCLUSION

For the foregoing reasons, the Court will deny Defendant's Motion for a Judgment of Acquittal (Doc. 166). A separate Order will be entered.

Robert D. Mariani
United States District Judge